769 A.2d 891

**Bobbett GREY, et al.**

v.

**ALLSTATE INSURANCE COMPANY, et al.**

No. 81, Sept. Term, 2000.

Court of Appeals of Maryland.

April 9, 2001.

446

Richard K. Green (Peter A. Greenburg and Eric M. Dickman of Greenburg, Spence & Green, L.L.C., on brief), Rockville, for appellants.

Laura L. Greeves (Sussman & Simcox, Chartered, on brief), College Park, for appellees.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

On the evening of September 11, 1997, Jumanne Smith, while intoxicated, was driving his Jeep Cherokee in the wrong direction on a highway ramp at a high rate of speed, when he collided with another vehicle occupied by Bobbett Grey, her mother, Delores Grey, and her nephew, Jordan Ashley. Delores was killed; Bobbett and Jordan were seriously injured. As a result of the incident, Smith was charged with a number of criminal offenses. In October, 1998, he entered into a plea agreement with the State, pursuant to which he pled guilty to manslaughter by automobile (Maryland Code, Article 27, § 388) and agreed to pay an aggregate of $85,000 in restitution—$40,000 to Bobbett, $25,000 to Jordan, and $20,000 to Delores's estate. Neither the text of the plea agreement nor information regarding whether any other punishment was imposed appears in the record before us.

In accordance with the plea agreement, the court, on January 7, 1999, entered an Order of Restitution. In that order, the court found that Bobbett, Jordan, and Delores's estate, appellants here, were entitled to restitution under Maryland Code, Article 27, § 807, and it ordered restitution in the amounts noted, with $15,000 of the $40,000 payable to Bobbett to be paid immediately. The court also ordered the clerk to record and index the order of restitution as a money judgment. That, apparently, was done. Smith paid the $15,000 as directed. Through wage garnishments, appellants have collected an additional $4,614. At some point, appellants filed a civil action against Smith in the Circuit Court for Howard County. The pleadings in that case are not in the record before us; we are informed only that the case has yet to be tried and is still pending.

At the time of the accident, Smith had in effect an automobile liability insurance policy issued by appellee, Allstate Insurance Company, with policy limits for personal injury of $20,000 per person and $40,000 aggregate and $10,000 for property damage. The case now before us arises from appellants' attempt to attach the proceeds of the insurance policy in partial satisfaction of the restitution order.

Shortly after entry of that order, appellants filed in the Circuit Court for Howard County writs of garnishment against Allstate, directing it to "hold the property of [Smith] subject to further proceedings." Allstate responded that it was not in possession of any property of Smith and was not currently indebted to Smith. Through a reply to that answer, appellants averred that the restitution judgment was "for compensatory damages arising out of the negligent operation of a motor vehicle," that Smith was insured by Allstate, that it therefore had a contractual obligation to pay Smith the judgment for compensatory damages, and that that obligation constituted "property, money or credit of the Judgment Debtor which is subject to garnishment." With the issue thus joined, both sides filed motions for summary judgment. In February, 2000, the court denied appellants' motions, granted that of Allstate, and entered judgment in favor of Allstate.

Appellants appealed, and we granted *certiorari*, on our own initiative, before decision by the Court of Special Appeals, to determine whether a garnishment action by appellants lies against Allstate under the circumstances of this case.

## DISCUSSION

The law governing the ordering of restitution in a criminal case is set forth in Article 27, § 807. That section is a long and detailed one and is not free from some ambiguity with respect to the issue before us.[1] Appellants look, in particular, to subsections (f) and (g) of the statute. The latter requires, in relevant part, that a judgment of restitution entered by a circuit court be recorded and indexed in the civil judgment index as a money judgment. Subsection (f) provides that, when the judgment is so recorded and indexed, it constitutes a money judgment in favor of the individual and may be enforced by the individual in the same manner as a money judgment in a civil action. Thus, appellants argue, when the order of restitution in this case was docketed as a money judgment on January 21, 1999, it became no different than any other money judgment so recorded. It established an amount that Smith was legally obligated to pay and, accordingly, triggered Allstate's contractual obligation to pay that amount to Smith. That obligation, they urge, became property of Smith in the hands of Allstate and was therefore subject to garnishment.

Allstate, of course, has a different view. It notes, first, that, by filing the separate civil action, in which damages far exceeding $85,000 are sought, appellants have recognized that the order of restitution is not a "bonafide civil judgment" against Smith. Additionally, it argues that, if the order of restitution really carried the same weight as a normal civil judgment, Smith would be denied his right of civil jury trial on the issues of liability and damages and Allstate would be

---

1. As part of the ongoing code revision process, the provisions in § 807 will be recodified in §§ 11–603 through 11–614 of the Criminal Procedure Article, effective October 1, 2001.

denied its right to compromise and settle the case. Finally, it contends that appellants have no standing, in any event, to garnish the policy proceeds, as Smith, himself, presently has no right to sue on the policy.

For the reasons to be explained, we agree with the ultimate position of Allstate. Appellants' argument, focused, as we have said, on § 807(f) and (g), overlooks other provisions of § 807 that must be read together with subsections (f) and (g) in the context of the overall purpose of restitution, and overlooks as well the nature of the restitution judgment and of Allstate's rights and obligations under its policy.

It is important, in any analysis of § 807, to keep in mind that restitution under that statute is a *criminal sanction*, not a civil remedy. That is clear from both the statute itself and from the more recent historical development of restitution generally. The order of restitution, even when entered as a civil judgment, concludes only the matters that were raised or that could have been raised, in the criminal proceeding. Although it may be enforced in the manner that a civil judgment may be enforced, it does not, and cannot, establish civil liability for anything beyond the matters it concludes.

Restitution as a means of penance for criminal behavior has its roots in ancient societies. Stephen Schafer writes that "[t]he basis of primitive and early Western law was personal reparation by the offender or the offender's family to the victim." STEPHEN SCHAFER, THE VICTIM AND HIS CRIMINAL 8 (1968).[2] Provisions for restitution appear in the earliest re-

---

2. Schafer's works, including this one, are cited in respectable journals and seem, therefore, to be regarded as an authoritative source for the historical role and treatment of restitution. *See* Bruce R. Jacob, *Reparation or Restitution by the Criminal Offender to his Victim: Applicability of an Ancient Concept in the Modern Correctional Process*, 61 J.Crim. L., Criminology & Police Sci. 152, 154–55 (1970); Richard C. Boldt, *Criminal Law: Restitution, Criminal Law, and the Ideology of Individuality*, 77 J.Crim. L. & Criminology 969 (1986); Note, *Victim Restitution in the Criminal Process: A Procedural Analysis*, 97 Harv. L.Rev. 931 (1984).

corded codes.[3] In the Code of Hammurabi, written about 1800 B.C., and in the Book of Exodus, recording events 600 years later, are requirements for restitution for what we now regard as criminal conduct, mixed among the capital and corporal penalties.[4] Schafer notes that, in some ancient societies, "[f]or injuries both to person and property, restitution or reparation in some form was the chief and often the only element of punishment." *Id.* at 12.

Through these various codes, restitution was offered as the more civilized alternative to private retribution. The State, as such, had not yet arrogated to itself the role of punishing conduct that injured only other individuals and not the community as a whole, and the "payback" for such injurious conduct was private retribution, either by the injured person or his or her family or clan—the "blood feud." Through restitution, the offender could avoid retribution to himself or his family by providing compensation to the victim or the victim's family. In the Twelve Tables, for example—the earliest codification of Roman law (c. 450 B.C.)—it is provided that,

---

**3.** The literature refers to restitution, reparation, and composition, which were different concepts but, for our purposes, are sufficiently similar to permit a common term, restitution, to be used. The differences were essentially in whether the victim was compensated in kind (restitution) or in money or some other medium of exchange (reparation) and whether he was made whole and the offender was relieved from further retribution as part of a negotiated resolution of the matter (composition).

**4.** Under the Code of Hammurabi, if one knocked out the eye or broke the limb of a patrician, he would suffer the loss of his own eye or the breaking of his own limb (§§ 196, 197), but if he knocked out the eye or broke the limb of a patrician's servant, he was to pay half the value of the servant (§ 199). In Exodus 21:18, it is decreed that, if a man injures another with his fist or a stone, "he shall pay for the loss of his time, and shall cause him to be thoroughly healed." Johns records a case from Assyria in the Seventh Century B.C. "[A] scribe A prosecuted a farmer B for the theft of a bull. They came before Nabu-zer-kenish-lishir, the deputy hazanu of Nineveh. Restitution, bull for bull, was imposed on the defendant, who meantime was held for the fine. 'On the day that he shall have made good the value of the bull he shall go free.' Dated the 12th of Elul. Eponymy of Mushallim–Ashur. Twelve witnesses." C.H.W. JOHNS, BABYLONIAN AND ASSYRIAN LAWS, CONTRACTS AND LETTERS 107 (1904).

"[i]f one has maimed a limb and does not compromise with the injured person, let there be retaliation." Table VIII.

The requirement of restitution for injuries to both property and person continued into later Roman times under the *Lex Aquilia* and through the time of Justinian in the Sixth Century. *See* THE INSTITUTES OF JUSTINIAN, Book IV, Title III, J.B. Moyle (5th ed.1913). It carried over as well into Anglo Saxon England. One of the earliest surviving documents written in the English language, the Dooms (Laws) of Aethelberht, King of Kent from 560–616 A.D., deals almost entirely with the monetary compensation to be paid for various offenses, as do the Dooms of Kings Hlothhaere and Eadric (673 686) and the Dooms of King Alfred (871–901). MEDIEVAL SOURCEBOOK: THE ANGLO-SAXON DOOMS, 560–975, http://www.fordham.edu/halsall/source/560–975dooms.html. Schafer notes that, by the time of Alfred, "the feud was resorted to only after compensation had been requested and refused." SCHAFER, *supra*, at 16.

Until the late Middle Ages, there was no clear distinction between criminal and civil law, and the restitution provided for in the various codes was regarded more as recompense for the damage or injury inflicted on the victim than as punishment for an offense against the State or the Sovereign. In England and elsewhere, that began to change, as the kings increasingly extended their authority over public order. Even under Anglo Saxon law, before the Norman invasion, there developed a distinction between public offenses and private wrongs, as certain kinds of disruptive and injurious behavior came to be regarded as offenses against "the king's peace." A breach of the king's peace, record Pollock and Maitland, "was an act of personal disobedience, and a much graver matter than an ordinary breach of the public order; it made the wrong-doer the king's enemy." FREDERICK POLLOCK AND FREDERIC MAITLAND, 1 THE HISTORY OF ENGLISH LAW 45 (2d ed. 1899). Still, compensation remained an integral part of the penalty imposed on a miscreant, although, increasingly, a greater share of it was diverted to the king or the local lord. Under Anglo Saxon practice, according to Schafer:

"One part of the compensation went to the victim (*Wergeld, Busse, emenda, lendis*). The other part went to the community or the king (*Friedensgeld, fredus, gewedde* ). In Saxon England, the *Wer,* or payment for homicide, and the *Bot,* the betterment or compensation for injury, existed alongside the *Wite,* or fine paid to the king or overlord. This twofold payment enabled the offender to buy back the security that he had lost. The double nature of the payment shows clearly the close connection between punishment and compensation."

SCHAFER, *supra,* at 18–19. *See also* 1 POLLOCK AND MAITLAND, *supra,* at 38, 47–49; 2 POLLOCK AND MAITLAND at 450–52 ("The offender could buy back the peace that he had broken. To do this he had to settle not only with the injured person but also with the king: he must make *bot* to the injured and pay a *wite* to the king.").

In time, however, the right of the victim became subservient to, and eventually was replaced by, the right of the Sovereign. As Schafer notes, "the injured person's right to restitution began to shrink, and, after the Treaty of Verdun divided the Frankish Empire [in 843], the fine that went to the state gradually replaced it entirely. The double payment continued, but now the king or overlord took all of it." SCHAFER, *supra,* at 19. Thus, "[a]s the state monopolized the institution of punishment, the rights of the injured were slowly separated from the penal law: composition, as the obligation to pay damages, became separated from criminal law and became a special field in civil law." *Id.* This change, notes Schafer, marked the closing phase of the period during which criminal procedure "was the private or personal concern of the victim or his family and was largely under their control," in which the wrong done to the victim was not simply *an* issue but was the only issue. *Id.*

With the separation of criminal and civil law and the assumption of full control over the former by the State, the victim eventually lost any right to compensation, at least for personal injury, through the criminal process; any monetary

exaction was in the form of a fine that went to the State. *See* Comment, *Compensation to Victims of Violent Crimes,* 61 Nw. U.L.Rev. 72, 76–84 (1966); *see also* Patrick D. McAnany, *Restitution as Idea and Practice: The Retributive Process, in* Offender Restitution in Theory and Action 15, 16–17 (Burt Galaway & Joe Hudson eds., 1977). That development, at least with respect to serious offenses, had been completed by the 18th century. Blackstone acknowledged that every public offense was also a private wrong but noted that, at least as to the serious offenses, "the public mischief is the thing." William Blackstone, 4 Commentaries on the Laws of England 6 (1769). Thus, he wrote that "in these gross and atrocious injuries the private wrong is swallowed up in the public: we seldom hear any mention made of satisfaction to the individual; the satisfaction to the community being so very great." *Id.* Indeed, from a practical viewpoint, "as the public crime is not otherwise avenged than by forfeiture of life and property, it is impossible afterwards to make any reparation for the private wrong; which can only be had from the body or goods of the aggressor." *Id.* With respect to those crimes of a less serious nature, in which the public punishment was not so severe, there *was* room for private compensation, but that was left to the civil action.[5]

The inability of a victim to recover compensation in the criminal proceeding was partly restored in the case of theft. Blackstone notes that, although at common law "there was no restitution of goods upon an indictment, because it is at the suit of the king only," by the statute 21 Hen. VIII, c. 11, restitution *was* provided to the victim in the case of a larceny prosecuted by the Crown. Blackstone, *supra,* at 355–56. That statute is not mentioned by Julian Alexander as being one of the English statutes carried over into Maryland law

---

**5.** Blackstone cites the crime of battery as an example: "the aggressor may be indicted for this at the suit of the king, for disturbing the public peace, and be punished criminally by fine and imprisonment: and the party beaten may also have his private remedy by action of trespass for the injury, which he in particular sustains, and recover a civil satisfaction in damages." Blackstone, *supra,* at 6.

through Article 5 of the Declaration of Rights, but the essence of it was included in an early colonial statute and was made part of our law in the first criminal code adopted by the General Assembly.[6] By 1809 Md. Laws, ch. 138, in contrast to the exclusive punishments of death or imprisonment mandated for such crimes as murder, manslaughter, maiming, rape, sodomy, and arson, the law added as an *additional* punishment for burglary, robbery, and stealing offenses that the defendant "shall restore the thing taken to the owner or owners thereof, or shall pay him, her or them, the full value thereof."

The 1809 law further provided that, "in all cases where restitution or reparation is adjudged to be made to the party injured" and immediate restitution or reparation was not fully made, "the court before whom the offender is convicted shall, at the instance of the party injured, issue execution against the property of such convicted person, in the name of the person injured, for the value of the property taken, or so much thereof as is not restored, such value to be estimated by the said court." *Id.* at § 23. The law continued, in a *proviso*, that it was not to be construed as depriving the party injured "from having and maintaining a civil action against such offender, either before or after conviction, or against any other person, for the recovery of the money received or property taken, or the value thereof." *Id.* Those provisions remain in the law today with respect to theft and robbery. *See* Md. Code, Art. 27, §§ 342(f), 486, 488, 806.

Notwithstanding the unbroken existence of the 1809 law permitting the criminal court to enforce a restitution order entered upon a theft conviction by attachment of the defendant's property, we are aware of no reported case in which that was done. The only reported case under the statute

---

6. In 1715, the Provincial Assembly, by Chapter 26, provided that a person convicted of the theft of goods of a value less than 1,000 pounds of tobacco was to pay fourfold the value of the goods stolen, restore the stolen goods, and be put in the pillory and given up to 40 lashes. If he was unable to pay the fourfold penalty, he was to satisfy the fine by servitude.

arose from a bill in equity to seize the property of a defendant who had escaped custody prior to trial, and thus was never convicted; our predecessors affirmed a dismissal of the bill, ruling that the plaintiff was left to a civil action at law. *See Fletcher v. Hooper,* 32 Md. 210, 1870 WL 3943 (1870).

With the exception of the 1809 provisions, limited as they were to theft-type offenses, the right of a crime victim to restitution through the criminal process did not take hold in Maryland, or in most of the United States, until the mid 20th century. The movement to reconsider the plight of the victim actually began much earlier. Professor Harland notes that, "[f]rom the time that punishment of criminals and redress for victims of crime were originally affected by the medieval division of crimes and civil wrongs, jurisprudential commentators have debated the significance and wisdom of that division." Alan T. Harland, *Monetary Remedies for the Victims of Crime: Assessing the Role of the Criminal Courts,* 30 UCLA L. Rev. 52, 52 (1982) (citing works by Bentham, Austin, Holmes, Ferri, and Garofalo). The strict division and, with it, the relegation of victim compensation exclusively to the civil courts continued to have its adherents, however, especially among the legal community, their point being that the goal of the civil law is to compensate private wrongs, whereas the function of the criminal law is to redress public wrongs by punishing those who commit such wrongs, and that "because restitution is a form of compensation, it has no place in the criminal system." [7]

---

7. *Victim Restitution in the Criminal Process: A Procedural Analysis, supra,* 97 Harv. L.Rev. at 935. *See also In re Galbreath,* 24 N.D. 582, 139 N.W. 1050, 1051 (1913) (noting that "a criminal offense is an offense against the sovereign state, and not against an individual; and that no individual, not even the complaining witness, has the power or authority to control the action of his sovereign, whose dignity alone is sought to be vindicated"); *People v. Richards,* 17 Cal.3d 614, 131 Cal.Rptr. 537, 552 P.2d 97, 101 (1976) ("[d]isposing of civil liability cannot be a function of restitution in a criminal case"); 2 U.S. Dept. of Justice, Attorney General's Survey of Release Procedures: Probation 238 (1939) (commenting that "criminal justice has always been assumed to be administered for the protection of the whole of society and its concern with individuals injured by the criminal acts of others is said to

In part because of the increasing influence of victims' rights advocacy groups and in part due to public disenchantment with the ineffectiveness of traditional criminal sanctions in curbing criminal behavior, the proponents of change eventually succeeded in getting legislatures to provide additional mechanisms for compensating crime victims. One mechanism took the form of government compensation, as with our Criminal Injuries Compensation program (Md.Code, Art. 27, §§ 815–832; Criminal Procedures Article, §§ 11–801—11–819). *See* Harland, *supra,* 30 UCLA L.REV. at 59; *Compensation to Victims of Violent Crimes, supra,* 61 Nw. U.L.REV. 72; SCHAFER, *supra,* at 105–36. The other, relevant here, was the enactment of statutes expanding the ability of criminal courts to grant restitution as part of a sentence imposed upon conviction. Most States now have such statutes, and most of those statutes are generally similar to the one in Maryland. It appears, however, that only two States have dealt with the specific issue now before us. In Kansas, the statute itself states that a judgment of restitution is not an obligation or liability against any insurer or third-party payor, and an intermediate appellate court in California held that a judgment of restitution was similar to an award of punitive damages which, under California law, was not protected by insurance. *See* Kans. Stat. Ann. § 60–4301; *State Farm Fire & Cas. Co. v. Superior Court,* 191 Cal.App.3d 74, 236 Cal.Rptr. 216 (1987). Neither of those approaches operates in Maryland. We must decide this case based on the wording and purpose of § 807.

Several arguments were offered for allowing criminal courts to order restitution. One followed the pragmatic point made by Blackstone—that once the State exacted its retribution,

---

be merely incidental"); other references cited in Harland, *supra,* 30 UCLA L.REV. at 54 n. 13; and RESTATEMENT (SECOND) OF JUDGMENTS, § 85, cmt. a (stating that a criminal prosecution and a claim for a civil remedy are "regarded as separate causes of action"; a criminal prosecution "seeks to impose a penal sanction and to vindicate public order," whereas a civil sanction "seeks to secure compensation for the victim of a wrong or to prevent a wrong in the future, as by injunction").

through either fine or imprisonment, there was little or nothing left for a victim to collect from the offender in a civil proceeding. Another stemmed from the more jurisprudentially-based restorative theory of justice which, to some extent, is a return to the ancient view, still current in the Orient, that the most appropriate social response to injurious behavior is reconciliation with the victim through an acknowledgment of responsibility and compensation. The third principal argument, which responded more directly to the point pressed by proponents of a strict cleavage between the civil and criminal law, was that restitution, in many cases, actually promoted the goals of the criminal law and, for that reason, should be authorized as a criminal sanction.

The third argument appears to provide the most likely underpinning for restitution statutes. The argument addresses the three principal functions of criminal punishment-rehabilitation, deterrence, and retribution. Restitution is regarded as rehabilitative to the extent that it causes the offender to focus on the victim and the harm that he or she has caused to the victim. Traditional punishment, in the form of a fine or imprisonment, is impersonal; it is imposed and implemented by the corporate State and is more likely to be resented than to serve as a spur for self-examination and acceptance of responsibility. As noted in the Harvard Law Review article, "by ordering restitution, a court forces the defendant to acknowledge in concrete terms the harm he has caused." *Victim Restitution in the Criminal Process: A Procedural Analysis, supra,* 97 HARV. L.REV. at 938. Restitution is viewed as a deterrent, more so than a civil judgment, because it is usually tailored to the defendant's ability to pay and it must be paid personally by the defendant, not by an insurance company or other third party. As the Harvard note observes, "[a] civil damage award, in contrast, can be paid by a third party; the possibility that the defendant may not suffer the full impact of the award may diminish the award's deterrent effect." *Id.* at 941. *See also* SCHAFER, *supra,* at 115; Harland, *supra,* 30 UCLA L.REV. at 124 n. 405; *United States v. Buechler,* 557 F.2d 1002, 1007 (3d Cir.1977). The retributive

value of restitution lies not only in the personal economic detriment to the offender, who may be saddled with a non-dischargeable debt for quite some time,[8] but as well in satisfying society's demand for meaningful justice. It is the economic equivalent of the *lex taliones*—the offender must pay for the damage he or she has caused.[9]

We have, on several occasions, recognized restitution as meeting the objectives of both rehabilitation and retribution. In *Coles v. State*, 290 Md. 296, 305, 429 A.2d 1029, 1034 (1981), we declared that restitution needed to be viewed "as an aid in rehabilitating the defendant." *See also Lee v. State*, 307 Md. 74, 78, 512 A.2d 372, 374 (1986), concluding that the payment of restitution as a condition of probation was "for the fundamental purpose of rehabilitating the defendant and affording the aggrieved victim recompense for monetary loss." In *Songer v. State*, 327 Md. 42, 46, 607 A.2d 557, 559 (1992) and *Anne Arundel Cty. v. Hartford Accident*, 329 Md. 677, 685, 621 A.2d 427, 431 (1993), we also acknowledged the punitive effect of restitution.

Restitution statutes began to be adopted in the 1930's, initially in the context of statutes authorizing probation in lieu of incarceration, but later as a direct dispositional alternative. *See* Note, *Restitution and the Criminal Law*, 39 COLUM. L.REV. 1185, 1198 (1939). The first modern enactment in Maryland came in 1965 in the context of juvenile proceedings. By 1965 Md. Laws, ch. 260, the General Assembly authorized

---

**8.** *See Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (order of restitution entered as condition or probation not dischargeable in Chapter 7 bankruptcy proceeding). *See also* 1994 amendments to 11 U.S.C. § 1328 (overruling *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) and making restitution included in a sentence on debtor's conviction of crime non-dischargeable in Chapter 13 bankruptcy proceeding) and to 11 U.S.C. § 523(a)(13) (debt for payment of restitution issued under title 18, U.S.C. non-dischargeable).

**9.** The extent to which any of those goals would likely be served by restitution might well depend on the nature of the restitution plan. *See* Charles R. Tittle, *Restitution and Deterrence: An Evaluation of Compatibility,* included in Galaway and Hudson, *supra,* at 33–58.

the juvenile court (1) to award a judgment against the parents of a child who wilfully or maliciously stole or destroyed the property of another, in an amount up to $500, and, upon proof of an ability to pay, enforce that judgment through its contempt power, and (2) to order the child "to make restitution himself if such is feasible." That law was limited to juvenile proceedings and, initially, to situations in which property was stolen or destroyed. In 1974, the Legislature, as part of a new law authorizing criminal courts to place a defendant on probation without finding a verdict, provided that "[i]n all cases involving probation or probation without finding a verdict, the court may order restitution provided that the person is entitled to notice and a hearing to determine the amount of restitution, what payment will be required, and how the payment will be made." 1974 Md. Laws, ch. 795, enacting § 641 to Article 27 of the Code. *See Coles v. State, supra,* 290 Md. at 304–05, 429 A.2d at 1033. The scope of restitution under that statute was much broader, but the restitution was limited to being a condition of probation.

The first authorization of restitution as a direct sentencing option came in 1977, with the enactment of § 640 of Article 27. That Act provided that, upon conviction for a crime where property of another was stolen or damaged or where the victim suffered actual medical expenses, out-of-pocket expenses, or loss of earnings as a result of the crime, the court could order the defendant to make restitution, in addition to any other penalty provided for commission of the crime. The law provided that compliance with the order could be made as a sentence or a condition of probation or parole, that the defendant was to make payment to the Division of Parole and Probation, that the Division would keep records, forward any property or payments received to the victim, and notify the court if the defendant failed to pay, and that the court could then hold a hearing to determine whether the defendant was in contempt of court or had violated the terms of probation or parole. Finally, § 640 made clear that an order of restitution did not preclude the victim from proceeding in a civil action to recover damages from the defendant, but that a civil verdict

would be reduced by the amount paid under the criminal restitution order.

Over the years, a number of amendments were made to § 640, mostly to expand the list of recipients of restitution payments to include, as subrogees of a victim, government agencies and third party payors that had made payments to the victim. In 1989, the Legislature decreed that, if restitution is requested by either the victim or the State and the court does not order it, the court must state its reasons for not doing so. In that law, 1989 Md. Laws, ch. 487, the General Assembly also first directed that an order of restitution shall constitute judgment as in a civil action and shall be indexed and recorded. The legislative history of that statute suggests that the purpose of entering a restitution order as a civil judgment was to have the liability and the ability to enforce it survive the termination of supervision of the defendant by the criminal court or the Division of Parole and Probation. *See* Senate Judicial Proceedings Committee Bill Analysis of S.B. 417 (1989); also testimony on behalf of Justice Fellowship Advocates before House Judiciary Committee on House Bill 677 (1989). The current law came into effect in 1997, as part of the Victims' Rights Act of 1997. Much of the substance was already in place, although the Act merged into one section— § 807—the provisions dealing with restitution for criminal acts and restitution for the delinquent acts of juveniles that had previously been in separate sections.

Section 807(a) authorizes a court, *"in addition to any other penalty for the commission of a crime,"* to issue a judgment of restitution directing the defendant to make restitution if, among other things, (1) property of the victim was stolen, damaged, or destroyed "as a direct result of the crime," (2) the victim suffered actual medical, hospital, or funeral expenses or other direct out-of-pocket losses "as a direct result of the crime," (3) the victim incurred medical expenses that were paid by a governmental entity, or (4) the Criminal Injuries Compensation Commission paid benefits to a victim of the crime. The court may order restitution to the victim, any governmental agency, or a "third-party payor, including an

insurer, which has made payment to the victim to compensate the victim for a property loss or pecuniary loss under this subsection." § 807(a)(5). A court need not enter an order of restitution if it finds that the defendant does not have the ability to pay the judgment of restitution. § 807(a)(4).

When a judgment of restitution is entered under § 807, compliance may be "required in the judgment of conviction," or, if probation is ordered, shall be a condition of probation. § 807(b). Section 807(c) directs that restitution shall be made by the defendant to the Division of Parole and Probation or the Department of Juvenile Justice "under the terms and conditions of the judgment of restitution," and that the Division (or Department) "shall keep records of any payments or return of property in satisfaction of the judgment of restitution" and "forward any property or payments in accordance with the judgment of restitution and the provisions of this section" to the victim, government agency, or third-party payor. If the victim cannot be located, moneys collected by the Division from a judgment of restitution "shall be treated as abandoned property under Title 17 of the Commercial Law Article." § 807(m). That title, comprising the Maryland Uniform Disposition of Abandoned Property Act, sets forth procedures for attempting to locate and inform the owner of abandoned property and provides, if those efforts are unavailing, for the payment of an aggregate of $500,000 to the Maryland Legal Services Corporation and the balance to the General Fund of the State. If the defendant fails to make payment as ordered, the Division is required to notify the court, which "may hold a hearing to determine if the defendant ... is in contempt of court or has violated the terms of the probation." § 807(d).

Section 807(g), as noted, requires a judgment of restitution issued by a circuit court to be recorded and indexed in the civil judgment index as a money judgment and provides that, when so indexed, the judgment constitutes a lien on the defendant's land in the county. Subsection (f) provides that an indexed and recorded judgment of restitution constitutes a money judgment in favor of the individual, government entity, or

third-party payor and that it may be enforced by that person or entity "in the same manner as a money judgment in a civil action." Section 807(k), however, provides that a victim or other person may not execute on a judgment recorded and indexed if the defendant files a motion to stay execution of the criminal sentence or judgment of restitution and challenges the conviction, sentence, or judgment of restitution by filing (1) an appeal, (2) an application for leave to appeal following a guilty plea, (3) a motion for exercise of revisory power by the sentencing court, (4) application for review of sentence by three-judge panel, or (5) notice for in banc review. Execution is stayed under any of those circumstances until "a court issues a final judgment upholding the conviction, sentence, or judgment of restitution." Subject to all of those provisions, a judgment of restitution "may be enforced in the same manner as enforcing money judgments."

In enacting these provisions, the General Assembly understood that it was creating a special form of relief available through the criminal court that was not to supplant any relief that might be available to a victim or other person through the civil court. In § 807(e), it provided:

"A judgment of restitution may not preclude the owner of the property or the victim who suffered personal physical or mental injury or out-of-pocket loss of earnings or support from proceeding in an civil action to recover damages from the defendant. . . . A civil verdict shall be reduced by the amount paid under the criminal judgment of restitution."

When these various provisions are examined together, several conclusions emerge, and they all militate against the position espoused by appellants. One immediate observation is the apparent inconsistency between §§ 807(a)(5) and (f), on the one hand, and §§ 807(c), (d), and (m), on the other. Section 807(a)(5) permits the court to order that restitution be "made to" the victim and other eligible recipients; subsection (f) provides that the restitution judgment constitutes a money judgment in favor of the person or entity "to whom the defendant . . . has been ordered to pay restitution" and that it may be enforced by such person or entity in the same manner

as a money judgment in a civil action. Sections 807(c), (d), and (m), however, require the defendant to make restitution payments to the Division of Parole and Probation under the terms and conditions of the judgment and require that agency to keep records of all payments received, remit those payments to the victim or entity entitled to the restitution, and, if the victim cannot be located, treat the money collected as abandoned property. There appears to be no provision in the statute for any direct payment by the defendant to those persons. Indeed, the only sanctions for non-payment stated in § 807(d) are contempt proceedings or revocation of probation. There is no provision for coordinating any enforcement or collection of a restitution judgment by the victim with that of the Division of Parole and Probation or for the victim to notify the Division of any payments received from his or her own enforcement action, if such was actually contemplated.

The more significant problem with appellants' position is that it gives an unwarranted substantive significance to § 807(f)—one that not only raises serious due process concerns but is wholly inconsistent with the established law of judgments and the reasonable expectations of the insurer and insured. By virtue of that subsection, an order of restitution, when indexed and recorded, constitutes a money judgment, but it constitutes a judgment only with respect to the issues that were, or could have been, resolved by the order. It has been long and well established that a judgment concludes only those matters that were, in fact, decided in the action or, in the context of claim preclusion, that, with propriety, could have been litigated in that action. *See Alvey v. Alvey,* 225 Md. 386, 390, 171 A.2d 92, 94 (1961); *MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A.2d 486, 488–89 (1977); *FWB v. Richman,* 354 Md. 472, 493, 731 A.2d 916, 927 (1999). It can have no greater effect, either as a matter of fundamental due process or as a matter of issue and claim preclusion law.

An order of restitution entered under § 807 establishes, at most, two things: (1) that the defendant was guilty of a crime; and (2) that, as a direct result of that crime, the

persons or entities to whom the restitution is ultimately payable suffered losses (i) of a kind enumerated in the statute and (ii) at least in the amount stated in the restitution order. With the exceptions and limitations stated in the statute, when the order is entered and indexed as a civil judgment, the defendant's liability for the amount of the judgment may be enforced in the manner that any civil judgment for a debt may be enforced—by attachment of the defendant's property, by garnishment of wages. That is the essence of § 807(f). What that section does *not* do, however, is to create, on its own, a contractual liability between the defendant and a third party that otherwise would not exist. It does not make or convert an order of restitution into a judgment "for compensatory damages arising out of the negligent operation of a motor vehicle," as appellants contend.

In the making of the limited determinations that lead to a judgment of restitution, no consideration is given to any of the defenses that might be interposed in a civil action against the defendant based on his or her use of the insured automobile— whether, for example, any of the victims might have been guilty of contributory negligence, whether any might have assumed the risk of their injury, whether the statute of limitations may have run on their claims. Nor is any consideration given to the possible liability of any third persons who are not, and cannot be made, parties in the criminal action, and thus no account is taken of any rights of contribution or indemnity that the defendant may have or of reductions that might be mandated by the Uniform Contribution Among Joint Tort–Feasors Act. None of those defenses or matters are relevant in the criminal case; none are controlling in determining the propriety or amount of a restitution order. *See Duren v. State,* 203 Md. 584, 593, 102 A.2d 277, 282 (1954) (if defendant, on trial for automobile manslaughter, is guilty of gross negligence, "he cannot excuse his conduct and escape the consequences by showing that the deceased was guilty of contributory negligence"). Nor, to the extent that the amount of restitution is capped by the defendant's ability to pay, are the actual damages suffered by the victim necessarily ascer-

tained. Consideration of any of these matters could well result in a determination that is inconsistent with the restitution order.

This overall scheme, of excluding those matters from the criminal proceeding and leaving open the right of the victim or others to pursue a separate civil action, is in full harmony with the now—fundamental and clear separation of criminal and civil liability, with the modern view that restitution is a criminal sanction and not a civil remedy, and with the principles governing claim and issue preclusion—principles that would clearly allow the issue of Smith's civil liability necessary to trigger Allstate's obligations under its policy to be re-litigated in a subsequent civil proceeding.

■■■ Section 29 of the RESTATEMENT (SECOND) OF JUDG-MENTS, which sets forth limitations on the doctrine of issue preclusion, makes clear that, in determining whether a party is precluded by judgment from re-litigating an issue, consideration must be given, among other things, to whether the forum in the second action affords the party against whom preclusion is asserted "opportunities in the presentation and determination of the issue that were not available in the first action and could likely result in the issue being differently determined" and whether the first determination "may have been affected by relationships among the parties to the first action that are not present in the subsequent action, or apparently was based on a compromise verdict or finding." Section 85 of the RESTATEMENT (SECOND) applies those principles with respect to the effect of a criminal judgment in a subsequent civil action, and both of those circumstances are clearly present here. It is only in a subsequent civil action that the issues germane to Smith's tort liability and Allstate's contractual liability can be resolved. As is the situation in 90% or more of the criminal cases initiated in Maryland, this one ended in a plea agreement—an acknowledgment of guilt by the defendant and an agreement to a restitution order in which Allstate had utterly no role to play.

 The insurance policy issued by Allstate clearly contemplates indemnity against civil liability, established either by settlement effected by Allstate, by civil arbitration, or by trial in a civil action. It protects the insured against "claims for accidents," not liability for criminal behavior. It requires the insurer to defend the insured person "sued as the result of an auto accident," not indicted or otherwise formally charged with the commission of a crime, and it authorizes the insurer to choose defense counsel and to settle "any claim or suit if we believe it is proper." None of those rights or duties are applicable in the context of a criminal action. The insurer cannot exercise its right to defend, to choose defense counsel, or to settle the action. Appellants' position would impose liability on the part of the insurer without affording it any of its contractual rights under the policy. Apart from the obvious Constitutional impediments to such an approach, we can find no evidence that the General Assembly ever intended for § 807 to operate in that manner.

For these reasons, we hold that an order of restitution issued under § 807, even when entered and indexed as a civil judgment, does not suffice, on its own, to create liability under a standard automobile insurance policy and thus does not convert the insurer's contractual obligation of indemnity into property of the insured in the hands of the insurer that is subject to garnishment.

JUDGMENT OF CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED, WITH COSTS.