991 A.2d 1257

CROFTON CONVALESCENT CENTER, INC.

v.

DEPARTMENT OF HEALTH & MENTAL HYGIENE, NURSING HOME APPEAL BOARD.

No. 32 Sept.Term, 2008.

Court of Appeals of Maryland.

April 8, 2010.

conditions of probation and obtains a "discharge" under CP § 6–220(g).

**204**

Howard L. Sollins (Diane Festino Schmitt of Ober, Kaler, Grimes & Shriver, Baltimore, MD), on brief, for Petitioner.

Mark J. Davis, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

BARBERA, Judge.

In this case we decide whether, under the Code of Maryland Regulations ("COMAR") 10.09.10.10,[1] a Medicaid provider that made payments pursuant to an interest rate swap agreement

---

1. Unless otherwise noted, all references to COMAR are to Title 10, Subtitle 09, Chapter 10, which contains regulations governing the Department of Health and Mental Hygiene's federally approved reimbursement plan for nursing facilities.

can claim reimbursement of those payments as mortgage interest.

The petitioner, Crofton Convalescent Center ("Crofton"), is a nursing facility certified to provide medical care through the Maryland Medical Assistance Program ("Medicaid"). In 1998, Crofton entered into a financing arrangement that, through the use of an interest rate swap agreement, exchanged the variable interest rate on Crofton's mortgage for a fixed rate. Crofton then submitted the interest payments made according to the swap agreement ("swap payments") as mortgage interest payments for reimbursement from the respondent Department of Health and Mental Hygiene ("DHMH"). DHMH, however, disallowed Crofton's claim that interest paid under its swap agreement was a reimbursable expense under CO-MAR.

Crofton appealed DHMH's decision to the Nursing Home Appeal Board ("the Board"), which hears appeals from providers participating in Maryland's Medicaid program, and which ultimately affirmed DHMH's decision. Crofton then petitioned for judicial review in the Circuit Court for Baltimore City, which reversed the Board's decision. On appeal, a divided panel of the Court of Special Appeals held, in an unreported opinion, that the swap payments were not reimbursable.

Crofton argues that, because the financing arrangement that included the swap agreement was incidental to refinancing Crofton's mortgage, the Court of Special Appeals erred when it determined that the swap payments were not mortgage interest payments. For the reasons that follow, we hold that the Board applied the proper definition of mortgage interest and that Crofton's swap payments do not qualify as mortgage interest under that definition. We therefore affirm the judgment of the Court of Special Appeals.

I.

Crofton provides nursing and other medical services, in part, through Maryland's Medical Assistance Program ("Med-

icaid"), which is a state program partially funded by the federal government. *Liberty Nursing Center, Inc. v. Dep't of Health and Mental Hygiene*, 330 Md. 433, 438, 624 A.2d 941, 943 (1993). "When a state elects to participate in the [federal] medicaid program, it prepares and submits for approval by the federal Health Care Financing Administration ... a state medicaid plan for the provision of medical assistance that complies with the federal Medicaid Act[.]" *Jackson v. Millstone*, 369 Md. 575, 580, 801 A.2d 1034, 1037 (2002). "If the federal agency approves the state plan, then the state qualifies for federal funding, whereby the federal government will reimburse the state up to 50% of the cost of the medicaid program." *Id.* at 580, 801 A.2d at 1037.

Maryland's Medicaid program is administered by DHMH. *Id.* at 581, 801 A.2d at 1037. Pursuant to federal and state law, the Maryland Medicaid program reimburses nursing homes for patient-related costs of medical care, including interest payments on loans necessary for patient care. *See* Title XIX of the Social Security Act, 42 U.S.C.A. §§ 1396 *et seq.* (2006); 42 C.F.R. §§ 430–456 (2008); Md.Code (2009 Repl.Vol.), §§ 15–103, 15–105 of the Health General Article; COMAR 10.09.10 *et seq.* The Maryland Medicaid statutes charge DHMH with the promulgation of rules and regulations to govern the reimbursement of providers. *See* §§ 15–103, 15–105 of the Health General Article. Crofton's status as a Medicaid provider in Maryland entitles it to State reimbursements, which are issued by DHMH.

When DHMH denies reimbursement to a provider participating in Maryland's Medicaid Program, the Board considers the provider's appeal. The present case arises out of the Board's denial of Crofton's request that DHMH reimburse the swap payments Crofton made subsequent to refinancing its mortgage.

## This Case

In 1998, the term on Crofton's $4.2 million mortgage was expiring, bringing due a balloon payment on the loan. To avoid making the balloon payment, Crofton sought to refi-

nance the mortgage through a fixed rate loan. Crofton considered several bids, including a bid from M & T Bank ("the Bank") for a loan with a 6.55% fixed interest rate.[2] Seeking an even lower rate, Crofton entered negotiations with the Bank, which then produced a financing package that consisted of a $4.2 million term loan with an interest rate of LIBOR [3] plus one percent, a $500,000 term loan at an interest rate of LIBOR plus one percent, and a "swap agreement" trading the variable interest rate on the two term loans for a fixed interest rate of 5.5% based on a $4.7 million "notional amount," both of which quoted terms we next explain.

A basic, "plain vanilla," swap agreement "is a contract between two parties, . . . to exchange or 'swap' cash flows at specified intervals, calculated by reference to a particular rate or index." *See* S. Lawrence Polk & Bryan M. Ward, *A Guide to the "Regulatory No Man's Land" of Over–The–Counter Interest Rate Swaps*, 124 Banking L.J. 397, 399 (2007). The "[m]ost commonly employed [interest rate swaps] are fixed/floating rate swaps in which the first counterparty pays the second at designated intervals, a specific amount of interest based on a fixed interest rate multiplied" by an agreed principal amount called the "notional" amount. Stuart Somer, *A Survey of Legal & Regulatory Issues Relevant to Interest Rate Swaps*, 4 DePaul Bus. L.J. 385, 387 (1992). Concurrently, the second counterparty pays the first counterparty based on a floating interest rate, such as LIBOR, applied to the notional amount. *Id.* The notional amount is used solely to calculate the interest payments and is not exchanged between the parties. *Thrifty Oil Co. v. Bank of America Nat'l Trust and Sav. Ass'n*, 310 F.3d 1188, 1191 (9th Cir.2002) (adopting 249 B.R. 537 (S.D.Cal.2000)), *modified, Thrifty Oil Co. v. Bank*

---

**2.** At the time of the financing, the fixed rate loan offer came from First National Bank. M & T Bank subsequently bought a successor to First National Bank.

**3.** LIBOR stands for London Interbank Offered Rate, "a well-known index in the financial markets measuring interest rates." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1105 (7th Cir.2000).

*of America Nat'l Trust and Sav. Ass'n,* 322 F.3d 1039, 1043 (9th Cir.2003) (addressing counsel fee issue). The swap enables a party to hedge against interest rate fluctuations by exchanging "interest payment streams of one debt instrument for those of another, where both debt obligations are the same amount." Somer, *supra* at 387.

In *Thrifty Oil Co.,* a panel of the Ninth Circuit Court of Appeals explained a hypothetical five-year interest rate swap between Counterparties A and B:

> (1) Counterparty A agrees to pay a floating interest rate equal to LIBOR ...; (2) Counter-party [sic] B agrees to pay a 10% fixed interest rate; (3) both counterparties base their payments on a $1 million notional amount and agree to make payments semiannually. If LIBOR is 9% upon commencement of the first payment period, Counterparty B must pay A: (10%-9%) ★ $1 million ★ (.5) = $5,000. These net payments vary as LIBOR fluctuates and continue every six months for the term of the swap. If interest rates rise, the position of Counterparty B, the fixed-rate payor, improves because the payments it receives increase. For example, if LIBOR rises to 11% at the beginning of the next payment period, Counterparty B receives a net payment of $5,000 from A. Conversely, the position of Counterparty A, the floating-rate payor, improves when interest rates fall. The party whose position retains positive value under the swap is considered 'in the money' while a party with negative value is considered 'out of the money.'

310 F.3d at 1191–92.

Interest rate swaps are typically documented in a confirmation and a master agreement. *Id.* at 1192. The master agreement is often a standard form agreement prepared by the International Swaps and Derivatives Association ("ISDA"). *Id.* In this case, Crofton and the Bank memorialized the swap in an ISDA master agreement accompanied by a separate confirmation and amortization schedule.[4] Pursuant to the

---

4. "An 'amortizing' interest rate swap is a swap whose notional amount declines at specified intervals during its term." *Thrifty Oil Co.,* 310

financing package, Crofton agreed to refinance its mortgage with a term loan with a variable interest rate of LIBOR plus one percent and then to swap the variable rate with the Bank for a fixed rate of 5.5%. During the relevant time period, however, the variable interest rates were below 5.5%, and thus Crofton was required under the swap agreement to pay the difference to the Bank. If the LIBOR plus one percent rate had been above 5.5%, Crofton would have paid the variable rate loan amounts, and the Bank would have reimbursed Crofton for the difference, effectively bringing Crofton's interest payments back down to the 5.5% interest rate.

Under Crofton's accounting system, Crofton treated the swap payments as mortgage interest payments, which are reimbursable costs under COMAR 10.09.10.10.C. Crofton reports costs for which DHMH should reimburse providers ("allowed costs"), to DHMH each fiscal year. DHMH reviews the reports and adjusts the costs by disallowing costs that are not reimbursable under the applicable laws and regulations. In 2002, DHMH hired Clifton Gunderson, LLP, to review Crofton's 2002 cost report and to recommend adjustments. Based on its review, Clifton Gunderson determined that Crofton's swap payments were not eligible for reimbursement. Accordingly, DHMH disallowed the costs.

### The Litigation

Crofton appealed the decision to the Board, which referred the appeal to the Office of Administrative Hearings for a contested evidentiary hearing before an Administrative Law Judge ("ALJ").[5] The ALJ issued his recommended findings

---

F.3d at 1193 n. 5. Crofton's swap agreement was subject to an amortization schedule that declined at the same monthly rate as the total principal balance owed on Crofton's two term loans.

5. A provider challenging a DHMH decision may elect the manner in which the Board considers the appeal. COMAR 10.01.09.03D. A provider may request that the Board consider the appeal based solely on written materials; based on written materials and an informal oral argument; or based on evidence presented at a full evidentiary hearing. *Id.* When a provider chooses to argue an appeal at a full evidentiary

of fact and conclusions of law, finding that the interest payment should have been reimbursed on the grounds that the swap payments were part of an integrated mortgage transaction and mortgage interest payments are allowable costs. The ALJ's decision was based, in part, on the following findings of fact:

10. A separate agreement, the swap interest agreement, was entered into with a fiscal intermediary. The swap agreement required payments that would convert the floating rate term payments into a fixed 5.5% interest rate.

15. Mortgage interest paid by Medicaid providers is reimbursable by Medicaid.

17. The above referenced notes are part of a total capital financing agreement that includes linked mortgage interest and swap interest.

18. Under Generally Accepted Accounting Principles ("GAAP"), all of the above referenced interest payments to the bank are treated as mortgage interest.

DHMH filed exceptions with the Board, which then held a hearing at which both parties presented oral arguments.[6]

The Board accepted the ALJ's findings except the above-mentioned four findings of fact.[7] The Board determined:

Fact 10. The parties to the loan entered into a separate agreement called an interest swap rate agreement. (swap

---

hearing, the Board may designate an agency to conduct the hearing, but the Board is the ultimate administrative decision maker. *See* COMAR 10.01.09.06, 10.01.09.07 (providing that, when the Board does not conduct the hearing, the hearing officer should make recommendations to the Board, which issues the final decision).

6. If exceptions are made to the ALJ's findings, the Board will hold a hearing on the exceptions and make the final decision including findings of fact and conclusions of law. COMAR 10.01.09.06, 10.01.09.07.

7. The Board accepted the ALJ's background factual findings that Crofton is a nursing facility and part of the Medicaid program; Crofton sought to refinance its debt with a fixed rate mortgage, and the Bank offered it a variable rate mortgage; and, during the period at issue, the variable interest rate was below 5.5% and therefore Crofton was required to make swap payments.

agreement or interest swap agreement) Under the interest swap agreement, the two parties exchanged monthly interest payments, i.e., Crofton exchanged its variable or floating mortgage interest rate of LIBOR plus 1 for a fixed interest rate of 5.5%.

\* \* \*

Fact 15. Mortgage interest paid by Medicaid providers is reimbursable by Medicaid, subject to certain ceilings and exceptions.

\* \* \*

Fact 17. M & T Bank treats the 4.2 million dollar mortgage note and the second $500,000 mortgage note as one agreement requiring one monthly payment at the variable interest rate. It treats the swap interest agreement as a separate, independent agreement, requiring a separate payment.

Fact 18. Under Generally Accepted Accounting Principles (GAAP), the above referenced interest payments are treated as mortgage interest. However, under Medicaid reimbursement rules, GAAP is not controlling, state and federal regulations are.

After making these findings, the Board concluded that the interest payments under the swap agreement were not reimbursable. The Board reasoned as follows.

First, the Board evaluated the nature of a swap agreement and determined that payments under it did not meet the definition of mortgage interest. In reaching that conclusion, the Board noted that Maryland's Medicaid program applies the federal Medicare definition of mortgage interest, which is "the cost incurred for the use of borrowed funds. Interest on current indebtedness is the cost incurred for funds borrowed[.]" 42 C.F.R. 413.153(b)(1). Because Crofton's swap payments were interest paid on a notional amount, not on money borrowed under a mortgage agreement, the Board determined that the payments did not qualify as mortgage interest. Then, noting that COMAR does not expressly address swap payments, the Board, based on the COMAR provision that directs the Board to applicable federal law, *see*

COMAR 10.09.10.29, concluded that the federal Provider Reimbursement Manual ("PRM") provision addressing swap interest applied.[8] Under PRM § 202.2, swap interest payments are prohibited and, therefore, the Board affirmed the disallowance of the swap payments.

Crofton filed a petition for judicial review in the Circuit Court for Baltimore City. The Circuit Court reversed the Board's decision, finding that the refinanced mortgage and the subsequent interest rate swap agreement were two parts of an integrated transaction that effectively converted the swap payments into mortgage interest payments. The court therefore found that the swap payments were costs for which Crofton was entitled to reimbursement.

DHMH appealed to the Court of Special Appeals. That court first addressed the applicable standard of review of administrative agency decisions and rejected DHMH's contention that the court should review an agency decision for "substantial evidence." Instead, the court applied the standard articulated by this Court in *Adventist Health Care, Inc. v. Maryland Health Care Comm'n,* 392 Md. 103, 896 A.2d 320 (2006), which directs appellate courts to defer to an agency's interpretation of a regulation unless plainly erroneous or inconsistent with the regulation. *Id.* at 120, 896 A.2d at 330.

Then, citing *Thrifty Oil Co.,* 310 F.3d 1188, a bankruptcy case that examined interest rate swap agreements, the court concluded that swap payments are not interest payments because swap payments do not compensate a lender for the loan of any underlying debt. Further, the court determined that the Board appropriately applied PRM § 202.2 because COMAR does not define mortgage interest and COMAR 10.09.10.29 provides that, in the absence of any contrary state regulation, the reimbursement regulations should be interpreted in conformity with applicable federal statutes and regulations. PRM § 202.2 expressly denies reimbursement of swap

---

8. The PRM is a federal guide, published by the Health Care Financing Administration, that states use to determine whether costs of care will be reimbursed by the federal government.

payments. Accordingly, the Court of Special Appeals reversed the Circuit Court, holding that even though the swap payments were made incident to the refinanced mortgage, such payments are not interest on a loan and thus, as a matter of law, are not mortgage interest payments.

We granted certiorari, *Crofton Convalescent Center, Inc. v. Dep't of Health & Mental Hygiene,* 405 Md. 62, 949 A.2d 651 (2008), to address the following questions, the order of which we have reversed:

1. Should interest paid by a nursing care facility pursuant to an integrated mortgage financing transaction securing commercial real property that includes a swap agreement be treated without regard to the integrated nature of the transaction?

2. Does *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 310 F.3d 1188 (9th Cir.2002) establish Maryland law governing whether interest paid by a nursing care facility pursuant to a swap agreement that secures the facility's real property is mortgage interest under the Maryland Medicaid regulation making mortgage interest an allowable, reimbursed cost?

## II.

To determine whether, regardless of a provider's intent to "integrate" its swap and loan agreements, COMAR treats swap payments as mortgage payments for reimbursement purposes, we must examine the scope of the term "mortgage interest" as it appears in COMAR.

Crofton argues that the definition of mortgage interest is controlled by Maryland common law, which defines a mortgage as follows:

A loan is secured by a mortgage when: the property is conveyed or assigned by the mortgagor to the mortgagee, in form like that of an absolute legal conveyance, but subject to a proviso or condition by which the conveyance is to become void, or the estate is to be reconveyed, upon payment to the mortgagee of the principal sum secured, with

interest, on a day certain; and upon nonperformance of this condition, the mortgagee's conditional estate becomes absolute at law, and he may take possession thereof[.]

*Norwest Bank Minnesota v. Pence,* 132 Md.App. 363, 369, 752 A.2d 681, 684 (2000) (quoting *Equitable Trust Co. v. Imbesi,* 287 Md. 249, 253–54, 412 A.2d 96 (1980)). Based on this definition, Crofton argues that whether the swap payments constitute mortgage interest payments under Maryland law hinges on whether the Bank could foreclose on Crofton's property if Crofton failed to fulfill its swap payment obligations. Consequently, Crofton contends that because the swap agreement was secured by Crofton's property, which was therefore subject to foreclosure upon Crofton's default, "the interest due under the Swap Agreement <u>was</u> mortgage interest[.]" (Emphasis in original).

Crofton further argues that the Board improperly relied on the PRM's guidelines because the Board should only rely on federal statutes and regulations when COMAR is silent. Crofton asserts that COMAR is not silent as to mortgage interest reimbursement because COMAR 10.09.10.10C,[9] 10.09.10.10A,[10] and 10.09.10.10I[11] explicitly refer to mortgage interest and the reimbursement of interest costs associated with refinancing existing debt.

DHMH counters that COMAR does not explicitly refer to swap payments or interest paid pursuant to a swap agreement. DHMH argues, moreover, that without evidence that the agency intended the term mortgage interest, as referenced

---

**9.** COMAR 10.09.10.10C provides that "[t]he final Medical Assistance per diem reimbursement for capital in investor-operated and non-investor-operated facilities shall include ... [m]ortgage interest (including bond interest)." 10.09.10.10C(3).

**10.** COMAR 10.09.10.10A provides that the "Capital cost center includes ... mortgage interest[.]" 10.09.10.10.A(3).

**11.** COMAR 10.09.10.10I provides that "refinancing of existing debt is permitted as the basis for reimbursement calculations only to the extent of the outstanding principal balance remaining on the existing debt when ... [t]he existing debt has ballooned in accordance with the scheduled date reflected in the debt instrument[.]" 10.09.10.10I(1).

in the regulations, to include swap payments, COMAR cannot be construed to encompass swap payments. DHMH contends, instead, that mortgage interest should be interpreted according to the PRM as required by COMAR 10.09.10.29, which provides: "Except when the language of a specific regulation indicates an intent by the Department to provide reimbursement for covered services to Program recipients without regard to the availability of federal financial participation, State regulations shall be interpreted in conformity with applicable federal statutes and regulations." COMAR 10.09.10.29.

An agency's interpretation of a regulation is a conclusion of law. *Adventist Health Care*, 392 Md. at 121, 896 A.2d at 331; *Kushell v. Dep't of Natural Resources*, 385 Md. 563, 576, 870 A.2d 186, 193 (2005). Yet even when reviewing an agency's legal conclusions, an appellate court must respect the agency's expertise in its field. *Adventist Health Care*, 392 Md. at 121, 896 A.2d at 331; *Kushell*, 385 Md. at 576, 870 A.2d at 193. "[A]n administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Maryland Aviation v. Noland*, 386 Md. 556, 572, 873 A.2d 1145, 1154 (2005) (internal quotation marks and citations omitted); *see also Adventist Health Care*, 392 Md. at 120, 896 A.2d at 330 ("Judicial review of the decision of an administrative agency rendered in a quasi-judicial proceeding is quite narrow."). Likewise, " 'a great deal of deference is owed to an administrative agency's interpretation of its own regulation.' " *Adventist Health Care*, 392 Md. at 119–20, 896 A.2d at 330 (quoting *Maryland Transp. Auth. v. King*, 369 Md. 274, 288, 799 A.2d 1246, 1254 (2002)). "Despite the deference, 'it is always within our prerogative to determine whether an agency's conclusions of law are correct.' " *Adventist Health Care*, 392 Md. at 121, 896 A.2d at 331 (quoting *Kushell*, 385 Md. at 576, 870 A.2d at 193). Accordingly, we determine whether the Board's conclusions are "plainly erroneous or inconsistent with the regulation." *King*, 369 Md. at 288–89, 799 A.2d at 1254 (internal quotation marks and citations omitted); *Noland*, 386 Md. at 574 n. 3, 873 A.2d at 1156 n. 3 ("[A] reviewing court

must determine if the administrative decision is premised upon an erroneous conclusion of law." (internal quotation marks and citations omitted)).

█ Although we keep in mind the considerable weight afforded an agency's interpretation of its regulations, we may not abdicate our responsibility to examine independently the regulations upon which the Board relied in deciding Crofton's appeal, to " 'determine if the administrative decision is premised upon an erroneous conclusion of law.' " *Noland,* 386 Md. at 574 n. 3, 873 A.2d at 1156 n. 3 (quoting *United Parcel v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994)). To do so in the present case, we must rely on principles of statutory interpretation to determine the meaning of the term "mortgage interest" under COMAR. *Miller v. Comptroller of Maryland,* 398 Md. 272, 282, 920 A.2d 467, 473 (2007) (" '[T]he interpretation of an agency rule is governed by the same principles that govern the interpretation of a statute.' ") (quoting *Maryland Comm'n on Human Relations v. Bethlehem Steel Corp.,* 295 Md. 586, 592–93, 457 A.2d 1146, 1149 (1983)).

█ "The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature." *Kushell,* 385 Md. at 576, 870 A.2d at 193 (citing *Collins v. State,* 383 Md. 684, 688, 861 A.2d 727, 730 (2004)). "Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Adventist Health Care,* 392 Md. at 124 n. 13, 896 A.2d at 333 n. 13 (internal quotation marks and citations omitted). When a statute's plain language is unambiguous, we need only to apply the statute as written, and our efforts to ascertain the legislature's intent end there. *Id.* at 125, 896 A.2d at 333; *Price v. State,* 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003).

COMAR's Department of Health and Mental Hygiene Title, Title 10, refers to mortgage interest several times. COMAR 10.09.10.10A and 10.09.10.10C address, respectively, costs included in a nursing facility's capital cost center and capital costs eligible for capital per diem reimbursement. Each

provision lists allowable costs, which include "mortgage interest (including bond interest)." COMAR 10.09.10.10A(3), 10.09.10.10C(3). Apart from this express statement clearly treating bond interest as mortgage interest, we agree with the Board that Title 10 does not define the scope of mortgage interest. *See* COMAR 10.09.10.01 ("Definitions").

The absence of an express definition of a term, however, does not preclude us from construing its plain meaning. When searching for a statute's plain meaning, we consider the language of the relevant provision not in isolation but within the context of the statutory scheme as a whole. *Adventist Health Care,* 392 Md. at 125 n. 13, 896 A.2d at 333 n. 13; *see also Price,* 378 Md. at 388, 835 A.2d at 1227 ("We do not read the statute divorced from its textual context, for 'adherence to the meaning of words does not require or permit isolation of words from their context.' " (citations omitted)). Moreover, when construing a statute's plain language, we "avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Price,* 378 Md. at 387, 835 A.2d at 1226 (acknowledging that a court may not "seek to construe the statute with forced or subtle interpretations that limit or extend its application") (internal quotation marks and citations omitted).

An examination of COMAR 10.09.10.10A and 10.09.10.10C, within the context of Title 10 (DHMH) in its entirety, compels the conclusion that swap payments are explicitly excluded from the definition of mortgage interest. Specifically, Title 10's "Interpretive Regulation," COMAR 10.09.10.29, directs us, in the absence of express evidence of the DHMH's intent to reimburse costs "without regard to the availability of federal financial participation," to interpret State regulations "in conformity with applicable federal statutes and regulations." COMAR 10.09.10.29; *see also Dep't of Health & Mental Hygiene v. Riverview Nursing Centre, Inc.,* 104 Md.App. 593, 598, 657 A.2d 372, 374 (1995) ("Where COMAR does not specify otherwise, federal Medicare principles of reimbursement, contained in the Medicaid Act, Provider Reimbursement

Manual (PRM), and Medicare regulations control"). COMAR 10.09.10.10 contains no indication of the DHMH's intent to reimburse costs "without regard to the availability of federal financial participation"; therefore, as directed by COMAR 10.09.10.29, we must interpret the term "mortgage interest" in conformity with the applicable federal authority. COMAR 10.09.10.07C(5), in turn, specifically directs us to the Medicare regulations and the PRM for guidance.[12] *Id.* ("Following the close of the provider's fiscal year, the Department or its designee shall determine the final per diem rates for that fiscal year. Appropriate final settlement and payment adjustments shall be made according to the Medicare Provider Reimbursement Manual, HCFA Publication 15–1, and this chapter."); *see also Liberty Nursing Center,* 330 Md. at 438–39, 624 A.2d at 943–44 ("[DHMH] has chosen to calculate a provider's 'final per diem rate' according to the principles established under Title XVIII of the Social Security Act ... and contained in the Medicare Provider Reimbursement Manual ["PRM"] ... unless otherwise specified by this chapter." (citations omitted)); *Riverview Nursing Centre,* 104 Md.App. at 598 n. 3, 657 A.2d at 374 n. 3 (explaining that the PRM "elaborate[s] upon the Medicare reimbursement regulations found in 42 C.F.R. Part 413").

Both the C.F.R. and the PRM define interest as "the cost incurred for the use of borrowed funds." 42 C.F.R. § 413.153(b); PRM § 202.1. Only necessary interest, however, qualifies as an allowable cost. 42 C.F.R. § 413.153(a); PRM § 202.2. Interest is necessary if it is "incurred on a loan that is made to satisfy a financial need, [f]or a purpose related to patient care, and [i]ncurred on a loan that is reduced by investment income." 42 C.F.R. 413.153(b)(2); PRM § 202.2. "The burden of proof to show that there is a financial need for the borrowing ... rests with the provider." PRM § 202.2A.

---

12. COMAR 10.09.10.08B(1) also provides that allowable costs for covered services are determined "according to the principles established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., and contained in the Medicare Provider Reimbursement Manual, HCFA Publication 15–1, unless otherwise specified by this chapter[.]"

Section 202.2A explicitly provides, however, that "[i]nterest expense incurred under an interest rate swap agreement is not recognized for Medicare payment purposes because the interest expense incurred under such agreement does not result from a loan made to satisfy a financial need of the provider." § 202.2A.

To illustrate this point, § 202.2A includes the following example:

> Hospital A has $10 million in bonds at a variable interest rate of prime plus 2%. The bonds were issued for a patient care related purpose and the interest is an allowable expense under Medicare. The hospital prefers a fixed rate and enters into a swap interest rate agreement with a bank. The amount of the note is $10 million. The agreement stipulates that the hospital will pay the bank a fixed rate of 12% and the bank will pay the hospital a variable rate of prime plus 2%.

> For the first year, prime remains at 10% and there is no exchange of funds between the bank and the hospital. For the second year, the prime drops to 8%. The hospital pays the bank $200,000 in interest. This interest is NOT reimbursable under Medicare. For the third year, the prime rate increases to 12%. The bank pays the hospital $200,000. This is NOT considered investment income for Medicare reimbursement. The transaction has no impact on the allowability of the interest expense associated with the bonds.

Although this example does not address mortgage interest specifically, the example is especially instructive because it addresses swap payments substituted for otherwise allowable interest payments.

Crofton distinguishes its swap payments by arguing that, unlike Hospital A's swap agreement, which was separate from the bonds, Crofton's swap agreement was an inseparable piece of an integrated financing package, and because the package refinances a mortgage secured by Crofton's property, the swap payments constituted mortgage interest payments.

Crofton further argues that the swap payments must be construed as mortgage interest payments because the "Bank and Crofton intended the Notes, Loan and Security Agreement, Swap Interest Agreement and Deed of Trust to function as a singular, non-severable transaction, not a separate, independent, stand alone agreement," and Maryland contract law requires courts to construe contracts in conformance with the parties' intent. Moreover, Crofton argues that Maryland public policy supports treating the swap agreement and the related loan as one integrated transaction because Crofton entered into the swap agreement in an effort to operate more efficiently and to lower Crofton's fixed costs.

Conversely, DHMH agrees with the Board's finding that the swap agreement was related to Crofton's loans only because the swap agreement enabled Crofton to "exchange interest rates without modifying the terms of the mortgage loan agreement" and "[t]he fact that in 2002 Crofton paid interest under both the loan and the swap agreements does not make the interest paid under the swap agreement reimbursable[.]" DHMH further agrees with the Board's determination that COMAR only allows reimbursement of interest expenses incurred to refinance existing debt or to obtain a new loan. Therefore, DHMH argues that the Board properly referred to the PRM to determine whether Crofton's swap payments were allowable costs.

We are not persuaded that Crofton's intent to integrate the swap and mortgage agreements overcomes the PRM's clear directive that swap payments, even when incurred in place of allowable interest expenses, are not reimbursable interest payments. Similar to Crofton, "Hospital A" entered into its swap agreement to secure a fixed interest rate on bonds upon which, but for the swap agreement, the provider would have made allowable interest payments. Even though the hypothetical swap agreement supplants the bonds' variable interest rate, the PRM explains that the swap payments are not bond interest payments and thus are not reimbursable. The PRM's analysis focuses on neither Hospital A's intent nor the swap agreement's effect-replacing the variable bond interest rate

with a fixed rate. Consequently, to treat Crofton's intent and the timing of the transactions as determinative in this case would be inconsistent with the PRM, and we decline Crofton's invitation to do so.

In promulgating its rules governing reimbursement of expenses, DHMH has elected, in the absence of an express indication of its intent to reimburse a specific expense, to decide reimbursement questions by resort to the C.F.R. and the PRM. *See* COMAR 10.09.10.29. This DHMH is authorized to do. *See* §§ 15–103, 15–105 of the Health General Article; *Adventist Health Care*, 392 Md. at 119, 896 A.2d at 330 (recognizing the authority of administrative agencies to " 'promulgate legislative-type rules or regulations in order to implement [a] statute. Such rules or regulations will often, of necessity, embody significant discretionary policy determinations.' ") (quoting *Christ v. Dep't of Natural Res.*, 335 Md. 427, 445, 644 A.2d 34, 42 (1994)). We owe deference to that discretionary exercise of DHMH's authority. *Cf. Liberty Nursing Center*, 330 Md. at 438–39, 624 A.2d at 943–44 (recognizing DHMH's authority to "calculate a provider's 'final per diem rate' according to ... the [PRM]" (citations omitted)).

We have said that COMAR does not explicitly encompass swap agreements; consequently, our interpretation of COMAR must be consistent with the C.F.R. and the PRM. The PRM's clear delineation of the difference between swap payments and otherwise allowable interest expenses compels the conclusion that the term "mortgage interest" under COMAR does not encompass swap payments regardless of a provider's intent to substitute those payments for otherwise reimbursable interest expenses. *See* COMAR 10.09.10.29.

Accordingly, we hold that the Board correctly relied on the PRM to determine that Crofton's swap payments were not reimbursable as mortgage interest payments under COMAR. We further hold that, because the PRM governs the interpretation of COMAR in this case, a provider's swap payments are *not reimbursable as mortgage interest payments under CO-*

MAR 10.09.10.10, regardless of a nursing care facility's intent to integrate a swap agreement and a mortgage refinancing agreement into a single transaction.

## III.

Our ruling that the PRM governs our interpretation of COMAR 10.09.10.10 obviates the need to address the second question Crofton presents, which invokes the correctness of the Board's application of *Thrifty Oil* to the analysis. We therefore affirm the judgment of the Court of Special Appeals on the sole ground that the Board properly referred to the PRM to determine that swap payments are not reimbursable mortgage interest under COMAR.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

ADKINS, J., dissents and files opinion joined by HARRELL, J.

Dissenting Opinion by ADKINS, Judge, which HARRELL, J., joins.

I respectfully dissent from the majority's holding that payments made pursuant to a interest rate swap agreement are, by definition, not "mortgage interest" under the Code of Maryland Regulations ("COMAR") 10.09.10.10. In my view this holding ignores the fundamental nature of the transaction between Crofton Convalescent Center, Inc. ("Crofton") and First National Bank of Maryland ("First National").

Examining the facts of the transaction reveals that the parties took a complicated route to reach a simple result. Crofton sought a fixed-rate loan from First National. After initial negotiations, First National offered Crofton a 6.55% fixed-rate loan, which was not accepted by Crofton. Subsequently, First National proposed a more complicated, two-step transaction. First, Crofton paid interest according to a variable rate. Second, First National and Crofton exchanged the difference between the variable rate and the 5.5% fixed rate,

which was the swap role. The variable interest payments existed only in form; in substance, they were subject to an immediate adjustment, via the swap payment, to the 5.5% level.

The majority, like the Board, dismantled the parties' Loan and Security Agreement, in order to reach its conclusion that the swap payments were a separate transaction from the mortgage loan, and therefore were not reimbursable because they were not "mortgage interest." In doing so, it ignored the clear and undisputed intent of the lender and borrower.

The majority defers to the Board's reasoning that the swap arrangement is separate from the mortgage loan simply because First National requested that Crofton make two separate payments, one for the swap, and one for the variable-rate loan. This bookkeeping accommodation made by Crofton for the lender is an insufficient basis for the Board's ruling that the swap payments were not part of an integrated loan agreement made for the purpose of refinancing the existing mortgage loan when the parties' clear written agreements say otherwise.

The Master Agreement, which sets up the swap arrangement between the parties, explicitly states:

> All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties ... and the parties would not otherwise enter into any Transactions.

"Transactions" is defined in the Master Agreement as "one or more transactions ... that are or will be governed by this Master Agreement, which includes the schedule ... and the documents and other confirming evidence ... exchanged between the parties confirming those Transactions." Correspondingly, the Loan and Security Agreement says: "The Borrowers and the Bank have entered into an ISDA Master Agreement dated the date hereof (which ... is herein called the 'Swap Agreement')." The Term Note for the $4,200,000 indebtedness proves that it is issued "pursuant to the provi-

sions of" the Loan Agreement. The Term Note for the $500,000 contains the same provision.

Equally important is the undisputed fact that Crofton sought from the bank a fixed 5.5% loan, turned down the bank's offer for a 6% loan, and deferred to the bank's proposal that this more complicated deal would accomplish what Crofton sought in the first place—a 5.5% loan for capital purposes. Yet the Board concluded as follows:

> The ALJ found that the swap agreement was an agreement linked to the above referenced notes, [i.e. for the $4.7 million dollar loan], to ensure that the interest rate was 5.5%. But that is exactly what a swap interest rate agreement is supposed to do. It allows one of the parties to swap the uncertainties of a floating or variable interest rate for the certainty of a fixed interest rate. Nor is the fact that the interest rate swap agreement includes a notional principal amount [footnote 2 omitted] that is the same as the amount of the loan unusual, controlling, or change the character of the agreement. Most, if not all, swap agreements refer to an amount that is the principal amount of a loan (i.e. the swap agreement's notional principal.) ... The stated amount of principal is "notional," because an interest swap agreement is a separate, independent, stand alone agreement [footnote 3 omitted] that does not modify or exchange the principal amount owed on the loan. In short, the interest swap agreement in question, like all interest rate swap agreements, did not produce a new loan or any additional principal for either of the parties to the agreement. The swap agreement simply allowed the parties to exchange interest rates without modifying the terms of the mortgage loan agreement.

The Board's rationale is circular and mischaracterizes this loan transaction. The Board's thinking goes like this: most transactions using swap agreements involve no actual loans; therefore the Crofton–First National transaction was not a mortgage loan because it included an interest swap agreement. This logic falls apart upon close perusal: classification of the transaction as a mortgage loan does not depend on

whether the amount of interest payable is at a set rate, or is determined by a formula. What COMAR says is that mortgage interest is reimbursable. So the Board should have considered whether the swap payments were mortgage interest, not whether most transactions involving swap payments involved actual loans. Instead, the Board made a sweeping generalization about swap agreements, and ignored the undisputed fact that the Loan Agreement, Notes, and Master Agreement constituted a refinance of an existing mortgage loan entered into by Crofton for operation of its facility.

Rather than looking at the transaction in question, as the Administrative Law Judge did, the Board relied on several internet definitions of swap agreements, which indicate that in the typical swap transaction the principal amount is never exchanged.[1] The possibility or popularity of using swap payments as investments securities should play no role in the Board's consideration of whether the bank actually loaned money to Crofton pursuant to a loan agreement and whether the swap payments were an integral part of that agreement.

Contrary to Respondent's suggestion, there is no evidence that Crofton entered into the swap agreement to gamble on market rates. The Administrative Law Judge found as a fact that the "swap agreement required payments that would convert the floating rate term payments into a fixed 5.5% interest rate." The parties' intent that Crofton pay 5.5% interest on the capital loan is undeniable.

COMAR 10.09.10.10(C) lists five classes of capital expenses which are reimbursable: "(1) Property taxes; (2) Property insurance; (3) Mortgage interest (including bond interest); (4) Net capital value rental; and (5) Central office capital costs." While the regulations provide detailed and complex reimburse-

---

1. *See, e.g.,* InvestorWords.com-Investing Glossary, http://www. investorwords.com, (last visited March 12, 2010); Investopedia.com, http://www.investopedia.com (describing swap agreements as: "Traditionally, the exchange of one security for another to change the maturity (bonds), quality of issues (stocks or bonds), or because investment objectives have changed. Recently, swaps have grown to include currency swaps and interest rate swaps.") (last visited March 12, 2010).

ment procedures and formulas, they do not provide further details regarding reimbursable capital expenses generally or mortgage interest in particular.[2]

As the majority acknowledges, "we may not abdicate our responsibility to examine independently the regulations upon which the Board relied in deciding Crofton's appeal[.]" Majority Op., *supra*, at 216, 991 A.2d at 1265–66. In my view, the majority does exactly this when it accepts the Board's reliance on the Federal Provider Reimbursement Manual ("PRM") Section 202.2A to justify its conclusion, because the limitations set forth in that subsection clearly do not apply to an integrated loan agreement like this one. PRM Section 202, titled "DEFINITIONS," provides the details to flesh out the requirement, set forth in PRM Section 200, that a cost will be reimbursable for "[n]ecessary and proper interest on both current and capital indebtedness[.]" It includes a subsection (Section 202.2) on what is considered "necessary" interest, which says that the interest must be "[i]ncurred on a loan that is made to satisfy a financial need" of the provider. Subsection A of Section 202.2 addresses what is meant by "financial need," and it starts out as follows: "When borrowed funds create excess working capital, interest expense on such borrowed funds is not an allowable cost." It is in this context that the PRM sets forth the example relied on by the Board for the proposition that swap interest payments are never reimbursable. The example involves a hospital that has issued ten million dollars in bonds, on which it pays interest to bondholders at a variable rate. Not liking the variable rate it must pay to the bondholders, the hospital hedges its risk by entering into a separate agreement with a bank, using the notional amount of ten million dollars principal, and stipulating

---

2. The Board utilized the definition of "mortgage interest" offered by the Department of Health and Mental Hygiene: "interest is the cost incurred for the use of borrowed funds." This is consistent with the definition of "interest" in Black's Law Dictionary as "[T]he compensation fixed by agreement or allowed by law for the use or detention of money, or for the loss of money by one who is entitled to its use; esp. the amount owed to a lender in return for the use of borrowed money." *Black's Law Dictionary* 886 (9th ed. 2009).

that "the hospital will pay the bank a fixed rate of 12% and the bank will pay the hospital a variable rate of prime plus 2%[.]" Under the PRM, this transaction constitutes use of excess working capital, and is therefore not reimbursable.

This example is not applicable to Crofton's loan. Unlike Crofton's loan, the swap interest rate agreement in the example does not "satisfy a financial need of the provider" because the hospital already had the capital it needed, which it obtained when it issued the bonds. The swap interest rate agreement was with a *third party*, and thus was separate and apart from the borrowing represented by the bonds. The third party bank never lent any money to the hospital.

Accordingly, I submit that it was wrong, as a matter of law, for the Board, tasked with applying the clear language of COMAR 10.09.10.10, which requires reimbursement to a nursing home for mortgage interest on capital loans, to rest its decision on the federal PRM addressing dissimilar financial arrangements utilized by a hospital that had issued bonds. The deference we give to agency determinations of law has limits. As the majority recognizes, " 'it is always within our prerogative to determine whether an agency's conclusions of law are correct.' " *Adventist Health Care, Inc. v. Md. Health Care Comm'n*, 392 Md. 103, 121, 896 A.2d 320, 331 (2006) (*quoting Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576, 870 A.2d 186, 193 (2005)). In my view, the majority errs in declining to exercise its prerogative to overrule the Board's misreading of the unambiguous term "mortgage interest[,]" contained in COMAR 10.09.10.10.

Judge HARRELL has authorized me to state that he joins in this dissenting opinion.