5 A.3d 1054

Christopher John SCHREYER

v.

William CHAPLAIN, Denise Webb–Cobb.

No. 121, Sept. Term, 2008.

Court of Appeals of Maryland.

Oct. 6, 2010.

Steven J. Potter, Chief Solicitor (George A. Nilson, City Solicitor, William R. Phelan, Jr., Principal Counsel, and David E. Ralph, Chief of Litigation, Baltimore City, Department of Law of Baltimore, MD), on brief, for petitioner.

Berry J. Diamond (Neil J. Lewis, P.A., Baltimore, MD), on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

BELL, C.J.

Christopher John Schreyer, the petitioner, a police officer employed by the Baltimore Police Department, seeks immunity, pursuant to Maryland Code (1990, 2006 Repl. Vol.) § 5–639 [1] of the Courts and Judicial Proceedings Article, and under the common law, pursuant to Maryland Code (1990,

---

1. Maryland Code (1990, 2006 Repl. Vol.) § 5–639 of the Courts and Judicial Proceedings Article—"Negligent operation of emergency vehicle"—states, in relevant part:

"(b) Liability of operator.—

"(1) An operator of an emergency vehicle, who is authorized to operate the emergency vehicle by its owner or lessee, is immune from suit in the operator's individual capacity for damages resulting from a negligent act or omission while operating the emergency vehicle in the performance of emergency service.

"(2) This subsection does not provide immunity from suit to an operator for a malicious act or omission or for gross negligence of the operator."

2006 Repl. Vol.) § 5–507[2] of the Courts and Judicial Proceedings Article, from liability for damages resulting from injuries sustained by William Chaplain and Denise Webb–Cobb, the respondents, during an accident caused by the petitioner while, during the course of his duties, he was driving an emergency vehicle. This Court granted the petitioner's Petition for Writ of Certiorari to address the following questions:

"1. Whether Petitioner's conduct constitutes, '[p]ursuing a violator or a suspected violator of the law;' thereby, qualifying as an 'emergency service' under Md.Code Ann[ ]. Trans. Art. § 19–103(a)(3)?

"2. Whether the Petitioner's statutory governmental immunity under Md.Code Ann[ ]. Cts & Jud. Proc. Art. § 5–639(b) renders him immune from the Respondents' suit.

"3. Whether the Petitioner's public official immunity renders him immune from the Respondents' negligence claims."

---

**2.** Maryland Code (1990, 2006 Repl. Vol.) § 5–507 of the Courts and Judicial Proceedings—"Immunity—Municipal corporations and officers"—states:

"(a) Contract actions.—In an action in contract described under Article 23A, § 1A of the Code, a municipal corporation, or its officer, department, agency, board, commission, or other unit of government, is not liable for punitive damages.

"(b) Nonliability of officials generally; torts involving motor vehicles.—

"(1) An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action.

"(2) An official of a municipal corporation is not immune from liability for negligence or any other tort arising from the operation of a motor vehicle except as to any claim for damages in excess of the limits of any applicable policy of motor vehicle liability insurance.

"(3)(i) Subject to subparagraph (ii) of this paragraph, a municipal corporation shall provide a defense for an official of the municipal corporation for any act arising within the scope of the official's employment or authority.

"(ii) A municipal corporation shall only provide a defense for an official of the municipal corporation for negligence or any other tort arising from the operation of a motor vehicle as to any claim for damages in excess of the limits of any applicable policy of motor vehicle liability insurance."

The first two issues are related and, thus, will, be considered, and resolved, together.

## I. *Statutory Immunity*

 Whether the conduct of the petitioner comes within the prescription of Maryland Code (1983, 2006 Repl.Vol.) § 19–103[3] of the Transportation Article is dependent upon how the word, "pursuing," or its variant, "pursuit,"[4] as used in reference to police officers engaged in "emergency service," under § 19–103(a)(3)(ii), is defined. Confident that the Legislature's choice of the word, "pursuing," was purposeful and, therefore, demands more than investigatory curiosity on the part of the officer, this Court will not extend the privilege of immunity, *see* § 5–639, to the petitioner. Instead we shall hold that the word "pursuing" or "pursuit" and its application must have limits and, more to the point, there must be, at a minimum, movement by a suspect or violator of the law, and reactive movement by the officer to apprehend said individual. It follows, therefore, that, pursuant to § 19–103(a)(3)(ii), the investigative actions of the petitioner cannot be construed to amount to "pursuing" or to constitute a "pursuit".

To be entitled to immunity under § 5–639, the petitioner, at the time of the accident, must have been authorized to "oper-

---

**3.** Maryland Code (1983, 2006 Repl.Vol.) § 19–103(a)(3) of the Transportation Article provides:

"Emergency service" means:
"(i) Responding to an emergency call;
"(ii) Pursuing a violator or a suspected violator of the law; or
"(iii) Responding to, but not while returning from, a fire alarm."
Section 19–103(b) mirrors § 5–639(b)(1) with respect to authorized operators of emergency vehicles engaged in emergency service. It provides:
"(b) Liability of operator.—An operator of an emergency vehicle, who is authorized to operate the emergency vehicle by its owner or lessee while operating the emergency vehicle in the performance of emergency service as defined in subsection (a) of this section shall have the immunity from liability described under § 5–639(b) of the Courts and Judicial Proceedings Article."

**4.** Given that "pursuing," is an inflected form of the root word "pursue," when applicable, variations of the word, e.g. "pursuit" will be used interchangeably.

ate" an "emergency vehicle in the performance of emergency service." *See* § 5–639(b)(1). The parties agree that the petitioner's marked patrol car was an "emergency vehicle." *See* Maryland Code (1957, 2006 Repl.Vol.) § 11–118 [5] of the Transportation Article. They also concede that the petitioner was authorized to drive this "emergency vehicle" on the day of the accident in question. At issue, therefore, is only whether, at the time of the accident, the petitioner was operating the "emergency vehicle in the performance of emergency service." Relevant to this issue, § 19–103(a)(3) provides:

" 'Emergency service' means:

"(i) Responding to an emergency call;

"(ii) Pursuing a violator or a suspected violator of the law; or

"(iii) Responding to, but not while returning from, a fire alarm."

The subsection in dispute here is § 19–103(a)(3)(ii), and, more specifically, the meaning of "[p]ursuing a violator or a suspected violator of the law," as used therein.

In order to resolve this issue, it is clear to this Court, as it was to the trial judge, that this case turns on what the Legislature intended the word "pursuing" to mean. Once that

---

**5.** Maryland Code (1957, 2006 Repl. Vol.) § 11–118 of the Transportation Article provides:

" 'Emergency vehicle' means any of the following vehicles that are designated by the Administration as entitled to the exemptions and privileges set forth in the Maryland Vehicle Law for emergency vehicles:

"(1) Vehicles of federal, State, or local law enforcement agencies;

"(2) Vehicles of volunteer fire companies, rescue squads, fire departments, the Maryland Institute for Emergency Medical Services Systems, and the Maryland Fire and Rescue Institute;

"(3) State vehicles used in response to oil or hazardous materials spills;

"(4) State vehicles designated for emergency use by the Commissioner of Correction;

"(5) Ambulances; and

"(6) Special vehicles funded or provided by federal, State, or local government and used for emergency or rescue purposes in this State."

is established, that meaning will inform whether, under the facts and circumstances of this case, the petitioner was, indeed, "[p]ursuing a violator or suspected violator" as contemplated by the statute.

When faced with a question of statutory interpretation, we must ascertain the intent of the legislature, the paramount object of that inquiry. *Bowen v. City of Annapolis*, 402 Md. 587, 613, 937 A.2d 242, 257 (2007) (quoting *Kushell v. Dep't. of Natural Res.*, 385 Md. 563, 576, 870 A.2d 186, 193 (2005)); *Collins v. State*, 383 Md. 684, 688, 861 A.2d 727, 730 (2004). "Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Adventist Health Care Inc. v. Maryland Health Care Comm'n*, 392 Md. 103, 124 n. 13, 896 A.2d 320, 333 n. 13 (2006). Where the relevant text, given its plain and ordinary meaning, is unambiguous, we "apply the statute as written, and our efforts to ascertain the legislature's intent end there." *Crofton Convalescent Ctr., Inc. v. Dep't of Health & Mental Hygiene*, 413 Md. 201, 216, 991 A.2d 1257, 1266 (2010). "The absence of an express definition of a term, however, does not preclude us from construing its plain meaning." *Id.* at 217, 991 A.2d at 1266(2010). "[W]e consider the language of the relevant provision not in isolation but within the context of the statutory scheme as a whole," *id.*, 991 A.2d at 1266 (2010), and can "consult the dictionary to elucidate terms that are not defined in the statute." *Maryland–National Capital Park & Planning Comm'n v. Anderson*, 164 Md.App. 540, 579, 884 A.2d 157, 180 (2005). While the dictionary may be a "starting point" to ascertaining the Legislature's intent, it is "not necessarily the end." *Morris v. Prince George's County*, 319 Md. 597, 606, 573 A.2d 1346, 1350 (1990). Without adding or deleting language to force a meaning that was not intended, we "attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Clipper Windpower v. Sprenger*, 399 Md. 539, 554, 924 A.2d 1160, 1168 (2007).

■ "If, after considering the plain language [of the statutory text] in its ordinary and common sense meaning," there remain "two or more equally plausible interpretations," "the general purpose, legislative history," and other extraneous interpretative aids are examined in an effort to resolve, or clarify, the ambiguity. *Uninsured Employers' Fund v. Danner*, 388 Md. 649, 659, 882 A.2d 271, 278 (2005); *Henriquez v. Henriquez*, 413 Md. 287, 297–98, 992 A.2d 446, 453 (2010); *see also Haupt v. State*, 340 Md. 462, 471, 667 A.2d 179, 183 (1995).

The word "pursuing" or "pursuit" must also be construed within its context and informed by the Legislature's intention. *Henriquez*, 413 Md. at 298, 992 A.2d at 453 ("The plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect."); *Ray v. State*, 410 Md. 384, 405, 978 A.2d 736, 748 (2009) ("When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the 'purpose, aim, or policy of the enacting body,' *Serio v. Baltimore County*, 384 Md. 373, 390, 863 A.2d 952, 962 (2004); *Drew v. First Guar. Mortgage Corp.*, 379 Md. 318, 327, 842 A.2d 1, 6 (2003), and attempt to harmonize provisions dealing with the same subject so that each may be given effect."); *McGlone v. State*, 406 Md. 545, 565, 959 A.2d 1191, 1202 (2008) ("The plain language of the statute is not interpreted in isolation, however. *Kushell*, 385 Md. at 577, 870 A.2d at 193. Rather, the statutory scheme of which it is a part must be analyzed, 'as a whole and [the Court must] attempt to harmonize provisions dealing with the same subject so that each may be given effect.' *Id.*"); *Bowen*, at 613–14, 937 A.2d 242, 258 (2007); *Magnetti v. Univ. of Md.*, 402 Md. 548, 565, 937 A.2d 219, 229 (2007); *Clipper Windpower, Inc. v. Sprenger*, 399 Md. 539, 554, 924 A.2d 1160, 1168 (2007); *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004); *Navarro–Monzo v. Washington Adventist Hosp.*, 380 Md. 195, 204, 844 A.2d 406, 411 (2004).

With these principles firmly in mind, it is important to rehearse the facts. The petitioner, a member of the Baltimore Police Department's Special Enforcement Team, whose focus is violent crime detection and drug offenses, was driving a marked patrol vehicle when he observed what he believed to be an illegal drug transaction. In his words, he saw a "bunch of individuals lined up [in an alley] and it appeared that one individual was handing small objects to the people in this line." Interested in investigating further, but not wishing to "alert them" to his presence, the petitioner, without activating his emergency lights or siren, made a u-turn down a one-way street, going against traffic. While so traveling, the petitioner's patrol car collided with the car driven by William Chaplain, in which Denise Webb–Cobb, was a passenger, injuring both.

The respondents filed a complaint in the District Court of Maryland sitting in Baltimore City, seeking damages for the personal injuries they suffered in the accident. They alleged that the petitioner's negligence was the sole cause of their injuries. Testifying at trial, the petitioner described his actions as an attempt to "pursue the suspected violators, the suspected drug dealer." That testimony prompted an objection by the respondents. Focusing on and emphasizing "the t[erm] pursue," the respondents' counsel observed, "I didn't hear anybody say anybody was running. They were standing there." Although the court overruled the objection, the respondents returned to the issue, when, on cross-examination of the petitioner, they asked: "How do you define pursuing in your line of work?" The following colloquy then ensued:

"[PETITIONER]: It could be all kinds of pursuit. I mean there's pursuing, that's either—in that way you're pursuing to try to catch the narcotics violators, which you wouldn't go lights and sirens blazing, you know, in there, you would use stealth to pursue that.

"If it was a person with a, with a gun that had just robbed someone and is running, well, obviously that would be.

\* \* \*

"[RESPONDENTS' COUNSEL]: If those guys didn't run, what were you gonna do?

"[PETITIONER]: If they didn't run?

"[RESPONDENTS' COUNSEL]: Yeah, if they just stayed there?

"[PETITIONER]: Then we would have approached them and done our investigations."

The petitioner also addressed the trial court's concern that "everything else ... in that part of ... section [§ 19–103(a)(3) ] kind of talks about exigent circumstances, like an emergency call is and they talk about responding to a fire alarm." He argued that his change in direction "in order to at least stop or encounter" the suspects conformed with the statute. Countering that argument, the respondents, consistent with the concerns expressed by the trial court, stressed that "pursuit" implied that there was an ongoing emergency, not unlike the fourth amendment cases, in particular those dealing with hot pursuit. They concluded that the petitioner was not acting "in the performance of an emergency service" and, rather than engaging in pursuit, the petitioner was "investigating suspected drug activity" while "cruising around looking for drug activity."

The trial court agreed with the definition of "pursuit in the *American Heritage Dictionary*," on which the respondents relied, to wit:

"1. pursue, to follow in order to overtake, capture, kill ... chase.

"2. follow, close upon, go with, attend.

"3. to strive, to gain, to seek, to attain, to accomplish[.]"

Accordingly, it was not convinced that the petitioner qualified for immunity pursuant to § 5–639. In fact, the trial court determined that the petitioner was not acting "in the performance of emergency service," because he was not pursuing a subject.

On appeal, the Circuit Court for Baltimore City affirmed that ruling. To do so, relying on *Torres v. City of Perth*

*Amboy,* 329 N.J.Super. 404, 748 A.2d 125 (N.J.Super.Ct.App.Div.2000), it interpreted § 5–639 to " 'require the police to engage in high-speed pursuit in order to attain immunity while operating the emergency vehicle in the performance of emergency services.' "

In *Torres,* a police officer, on routine patrol, clocked, by radar, a van proceeding in the opposite direction, to be traveling at 22 miles above the posted speed limit. As a result, he made a u-turn and proceeded after the van with the intention of stopping it and presumably giving the driver a traffic citation for speeding. *Id.* at 126. Before catching up to the van, the officer's vehicle struck a pedestrian, injuring him. *Id.* Reviewing the grant of summary judgment in favor of the officer, the New Jersey Superior Court interpreted N.J.S.A. 59:5–2(b)(2), a section of an immunity statute, captioned "Parole or escape of prisoner; injuries between prisoners." [6] Pursuant to that section, "[n]either a public entity nor a public employee is liable for: . . . any injury caused by . . . an escaping or escaped person." Characterizing the "core issue" as "whether [the police officer] was engaged in a 'pursuit' to which the immunity attaches," *id.,* the court concluded that he was not. The court reasoned:

"The New Jersey Police Vehicular Pursuit Policy (Pursuit Policy) . . . informs our consideration of the issue. It defines a pursuit:

'Pursuit driving is an active attempt by a law enforcement officer operating a motor vehicle and utilizing emergency

---

6. N.J.S.A. 59:5–2, in its entirety, provided:

"Neither a public entity nor a public employee is liable for:
"a. An injury resulting from the parole or release of a prisoner or from the terms and conditions of his parole or release or from the revocation of his parole or release;
"b. any injury caused by:
 "(1) an escaping or escaped prisoner;
 "(2) an escaping or escaped person;
 "(3) a person resisting arrest or evading arrest'
 "(4) a prisoner to any other prisoner.;or
"c. any injury resulting from or caused by a law enforcement officer's pursuit of a person."

warning lights and an audible device to apprehend one or more occupants of another moving vehicle when the officer reasonably believes that the driver of the fleeing vehicle is aware of the officer's attempt to stop the vehicle and is resisting apprehension by increasing vehicle speed, ignoring the officer or otherwise attempting to elude the officer.'

"The critical element in this definition is the officer's reasonable belief that the pursued driver is aware of a police attempt to stop the vehicle and the pursued driver 'is resisting apprehension by increasing vehicle speed, ignoring the officer or otherwise attempting to elude the officer.'

"We are persuaded that section 2b(2) immunity applies to a pursuit as defined in the Pursuit Policy[ ], but not to Officer Montalvo's attempt to close the gap on the speeding van. In *Tice* [*v. Cramer,* 133 N.J. 347, 627 A.2d 1090 (1993) ], the Court, in construing the phrase 'escaping person' in section 2b(2), stated that the phrase 'fairly describes someone who is fleeing from a police pursuit by vehicle.' ... 627 A.2d 1090. Additionally, the Court in *Tice* defined the issue before it as 'whether police officers in pursuit of a vehicle that has failed to heed their command to stop are immune from liability for injuries resulting from the pursuit.' *Id.* at 350, 627 A.2d 1090; *see also Fielder* [*v. Stonack,* 141 N.J. 101, 661 A.2d 231 (1995) ].

"... A pursuit involves at least two vehicles and often involves more than two. In contrast, a police officer's attempt to close the gap on a speeding vehicle that is not attempting to flee does not involve the risk synergies of a pursuit."

*Torres,* 748 A.2d at 126–27. Persuaded by this analysis,[7] the Circuit Court concluded:

---

**7.** While we agree with the judgment of the Circuit Court, as it will become clear *infra,* we need not, and do not, embrace its analysis. Instead, our holding will focus, not on whether the suspect knew that he or she was being pursued or the speed at which either the suspect, the violator or the police officer was traveling, but whether there was

"As the District Court correctly noted, there was no indication that the suspected violators of the law were aware or concerned about the police presence, or were going to leave the area or attempt to flee. Upon review of the statute and relevant case law, we cannot conclude that the District Court was clearly erroneous in its interpretation of the statutory language, and therefore the decision of the lower court must be affirmed."

Neither § 5–639 nor § 19–103 defines "pursuing" or its variant, "pursuit." The parties, however, have entered the breach and offered their differing interpretations. "Pursuit," the petitioner urges, is the natural consequence of a "reasonable belief that a crime has been committed," and it is the observations made by the officer which "create[ ] the emergency." In that regard, he adds, "[t]here is an exigency that the suspects and their contraband or other evidence of illegal conduct will be lost unless the police pursue the suspects at that moment." Thus, the petitioner favors an officer-centric approach, under which the officer's subjective belief and intent are determinative; there need not be an actual emergency or exigency. He rejects the notion that a suspect's knowledge of the officer's intention is relevant, and dictates whether the officer is entitled to immunity. The petitioner relies on the *Black's Law Dictionary* 1237 (6th ed.1990) definition of "pursue:" "[t]o follow, prosecute, or enforce a matter judicially, as a complaining party."

In contrast, the respondents, relying on the Merriam–Webster Dictionary Online's definition of "pursue": " 'to follow in order to overtake, capture, kill or defeat,' " listing "chase" as a synonym. They argue that the petitioner was not "pursuing" anyone when the accident occurred. They submit, in fact, that the petitioner, instead, was simply "approaching" the suspects. "Approach"—"draw closer to," Merriam–Webster Dictionary Online—and "pursue," they submit, are different; they are not interchangeable. It is clear, note the respondents, because

---

movement by both the suspect or violator of the law and the police officer, actively trying to apprehend the individual.

the suspects were "in a stationary position," the petitioner was not following or chasing them.

We agree with the respondents. Where the applicable term is not a defined term, this Court looks to the plain and ordinary meaning of the word. *Pelican Nat'l Bank v. Provident Bank,* 381 Md. 327, 336, 849 A.2d 475, 480 (2004); *Comptroller of the Treasury v. Kolzig,* 375 Md. 562, 567, 826 A.2d 467, 469 (2003). It then considers the definition in context with the purpose or object of the statute so as to avoid any interpretation that is "absurd, illogical, or incompatible with common sense." *Lockshin v. Semsker,* 412 Md. 257, 276–277, 987 A.2d 18, 29 (2010).

For our purpose, the only pertinent part, of the *Black's Law Dictionary* definition of "pursue" is "follow." Nevertheless, it must be reviewed in context, interpreted in conformity with the meaning of its companion terms [8]—to "prosecute, or enforce judicially, as a complaining party." The definition, in the same dictionary, of "pursuit," to wit, "[t]he act of chasing to overtake or apprehend," *Black's Law Dictionary* 1356, is

---

8. These other suggested meanings of "pursue" also provide guidance. While a prosecution may be initiated against a person without his or her knowledge, ordinarily its continuation, and, thus, active "prosecution" contemplates such knowledge. The same is true of judicial enforcement since it requires notice, actual or presumed. *Ayre v. State,* 291 Md. 155, 163, 433 A.2d 1150, 1155 (1981) ("Article 21 of the *Maryland Declaration of Rights* ensures '[t]hat in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence.' The purposes served by these organic requirements concerning the criminal charge are several: (i) to put the accused on notice of what he is called upon to defend by characterizing and describing the crime and conduct; (ii) to protect the accused from a future prosecution for the same offense; (iii) to enable the defendant to prepare for his trial; (iv) to provide a basis for the court to consider the legal sufficiency of the charging document; and (v) to inform the court of the specific crime charged so that, if required, sentence may be pronounced in accordance with the right of the case."); *see Russell v. United States,* 369 U.S. 749, 763–69, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Cruikshank,* 92 U.S. 542, 558, 2 Otto 542, 23 L.Ed. 588 (1876); *see also State v. Canova,* 278 Md. 483, 498–99, 365 A.2d 988, 997 (1976); *Lank v. State,* 219 Md. 433, 436, 149 A.2d 367, 368 (1959).

telling in this regard. A similar definition is carried by the Merriam–Webster Dictionary Online:

"1: to follow in order to overtake, capture, kill, or defeat

"2: to find or employ measures to obtain or accomplish: seek <pursue a goal>

"3: to proceed along <pursues a northern course>

"4a: to engage in <pursue a hobby> b: to follow up or proceed with <pursue an argument>

"5: to continue to afflict: haunt <was pursued by horrible memories>

"6: chase <pursued by dozens of fans>"

*See also American Heritage College Dictionary* 1112 (3rd ed.1997), which defines "pursue" as "1. To follow in an effort to overtake or capture; chase[,]" and "pursuit," in part, as "[t]he act or an instance of chasing or pursuing." Further informing the definition of "pursuit" or "pursue" are the definitions of its synonyms, "chase," and "overtake." "Chase" is defined in the Merriam–Webster Dictionary Online, in relevant part, as:

"1a: the hunting of wild animals—used with the

"b: the act of chasing: pursuit

"c: an earnest or frenzied seeking after something de-sired."

It is defined by the *American Heritage College Dictionary* 220 (3rd ed.1997) as:

"1. to capture to seize, esp. after a chase.

"2. To take by or as if by trapping or snaring."

That dictionary defines "overtake" as:

"1. a. to catch up with; draw even or level with. b. To pass after catching up with.

"2. to come upon unexpectedly; take by surprise."

*Id.* at 976.

What is striking about each of these definitions, made clear by the explicating terms, is that they are premised on movement on the part of the parties; movement by the pursuer and

by the person being pursued. To be sure, a non-moving target may be overtaken, but that would not have been as a result of a pursuit; rather he or she simply would have been approached, *albeit* stealthily. But a stealthy approach does not equate with being chased or pursued. Had the suspects spotted the officer attempting to approach surreptitiously and fled, and the officer followed, a pursuit, chase, would then have occurred. This factual scenario would then fall within § 19–103's definition of "pursuit."

The need for purposeful movement by both parties also comports with police manuals which use the word "pursuit" to discuss a chase or active search for a fleeing person. The *Prince George's County Police General Order Manual*, section 4/234/10 (1993)—DEFINITIONS, for example, defines "Vehicle Pursuit" as: "[a]ctive attempt by police to apprehend a motorist who exhibits a clear intention to avoid apprehension by high speed driving, evasive tactics . . . [and/or] [c]ontinuing normal driving actions, but willfully failing to stop on police signal." "Pursuit," according to the manual, may be initiated for "anyone who attempts to elude apprehension for a violation of the law." *See Manual* at Section 4/234.20. It logically follows that the same result would occur when the suspect or violator of the law is on foot. The *Prince George's County Police General Order Manual* describes vehicle pursuits as "one of the most potentially dangerous, high risk situations facing the law enforcement professional today." Section 4/234.05, January 31, 1994; *see also Howard County Department of Police General Order* OPS–48—Vehicle Pursuit Policy, Effective March 21, 2005, Section I. Policy. It is unlikely that, when the Police Department spoke of such severe risks it was referring to initial investigations. Notably, the manual's use of the word "pursuit" changes to "apprehend" when the person discontinues his or her efforts to flee. *See Manual* at Section 4/234.50—APPREHENSION.

The enactment of §§ 19–103 and 5–639 codified certain exceptions to the general rule that police officers must abide by the laws of the road, as would any lay citizen. The Legislature recognized, in so doing, that, in certain situations,

police officers and other drivers of authorized emergency vehicles must have the ability to deviate from the norm to perform their duties, without the fear of personal liability. *James v. Prince George's County,* 288 Md. 315, 326, 418 A.2d 1173, 1179 (1980) (" 'the official has the freedom and authority to make decisions and choices.' [*State, Use, Clark v. Ferling,* 220 Md. 109, 113, 151 A.2d 137, 139 (1959) ]. And in *Schneider v. Hawkins,* 179 Md. 21, 25, 16 A.2d 861, 864 (1940)' which 'denotes freedom to act according to one's judgment in the absence of a hard and fast rule. When applied to public officials, 'discretion' is the power conferred upon them by law to act officially under certain circumstances according to the dictates of their own judgment and conscience.' "). Given the enormous risk associated with disregarding the rules of the road, however, the Legislature only carved out three exceptions. These are found at § 19–103(a)(3). Notably, these shields from liability do not apply when the police officer is grossly negligent. *See Ashburn II v. Anne Arundel County,* 306 Md. 617, 621–24, 510 A.2d 1078, 1079–81 (1986). This is only fitting because, while police officers should be encouraged, and permitted, to do their job without unnecessary fear of liability, this saving cloak should be used sparingly and only when appropriate. *James,* 288 Md. at 327, 418 A.2d at 1180 (1980).

In the case of two of the situations delineated in § 19–103(a)(3)—emergency call and responding to fire—it is unmistakable that the General Assembly intended the exception for only those situations that require immediate attention, emergency situations. To the extent that the third—pursuing a violator or suspected violator—is ambiguous on this point, its inclusion with the other two clearly focused situations resolve the ambiguity and makes clear that it, too, is subject to the same requirement. *See e.g. Grey v. Allstate Ins. Co.,* 363 Md. 445, 451, 769 A.2d 891, 894 (2001) ("Appellants' argument, focused, as we have said, on § 807(f) and (g), overlooks other provisions of § 807 that must be read together with subsections (f) and (g) in the context of the overall purpose of restitution, and overlooks as well the nature of the restitution

judgment and of Allstate's rights and obligations under its policy."); *Gargliano v. State,* 334 Md. 428, 436, 639 A.2d 675, 678–79 (1994) ("Interpretation of the language of this statute in full context further requires that [Maryland Code (1957, 1992 Repl.Vol.) Article 27,] § 286(c) be read in conjunction with the other subsections of § 286 so that we may give effect to the whole statute and harmonize all of its provisions."); *see also In re Wallace W.,* 333 Md. 186, 190, 634 A.2d 53, 55–56 (1993) (" 'The doctrine of *ejusdem generis*[8] applies when the following conditions exist: (1) the statute contains an enumeration by specific words; (2) the members of the enumeration suggest a class; (3) the class is not exhausted by the enumeration; (4) a general reference supplementing the enumeration, usually following it; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires. It is generally held that the rule of *ejusdem generis* is merely a rule of construction and is only applicable where legislative intent or language expressing that intent is unclear.' 2A Sutherland Stat. Const. § 47.18, at 200 (5th ed.1992)."); *Rucker v. Harford County,* 316 Md. 275, 295, 558 A.2d 399, 408–09 (1989) ("Under the doctrine of *ejusdem generis,* where 'the general words in a statute, such as 'other things of value' . . . follow the designation of particular things or classes of subjects, . . . the general words in the statute will usually be construed to include only those things of the same class or general nature as those specifically antecedently mentioned.' ") (quoting *State v. Sinclair,* 274 Md. 646, 658, 337 A.2d 703, 711 (1975)). To read it otherwise is to give the statute an illogical interpretation. *Proctor v. Washington Metro. Area Transit Auth.,* 412 Md. 691, 706, 990 A.2d 1048, 1057 (2010); *Walzer v. Osborne,* 395 Md. 563, 573, 911 A.2d 427, 432 (2006); *B.F. Saul Co. v. West End Park,* 250 Md. 707, 722, 246 A.2d 591, 601 (1968); *Truitt v. Board of Public Works,* 243 Md. 375, 394, 221 A.2d 370, 382 (1966).

---

8. While this is not the exact situation here, this situation is certainly analogous.

That, for this statute to apply, exigent circumstances must exist can neither be overlooked, nor denied. The facts, as presented here, however, do not reflect such exigent circumstances. Consequently, this Court is unable to characterize the petitioner's actions as a "pursuit" as contemplated by § 19–103(a)(3)(ii). On this record, the petitioner, while on routine patrol for drug and violent offenders, saw something that caused him to want to investigate further. The record does not support the existence of any, never mind the requisite, exigency, that an immediate arrest was intended to be made on the basis of the observation or that one could have been made on that basis. In fact, the petitioner's testimony was that he only wanted to investigate the situation further. Acting on that desire is simply not tantamount to "pursuing."

Courts that have interpreted the legislative use of the word "pursuing" or "pursuit" in this, or similar, contexts, provide guidance. While this Court has never defined "pursuit," *but see Bost v. State*, 406 Md. 341, 958 A.2d 356 (2008) [7], case law from other jurisdictions confirm that "pursuing" involves more

---

7. In *Bost v. State*, 406 Md. 341, 958 A.2d 356 (2008), this Court considered whether certain evidence obtained from the defendant by a District of Columbia police officer who entered Prince George County in pursuit the suspect was admissible. On the following facts

"three officers, wearing jackets with 'Police' written across them, left their vehicle and walked towards about a dozen people who were drinking alcohol on the sidewalk in a no-loitering area. Officer Phillip testified that he 'conducted a contact,' at which time, one of the people, later identified as Robert Bost, immediately left, walking away 'in a briskful manner' while clutching his right waistband with his right elbow. Officer Phillip said that Bost started[,] picked up his pace, and 'immediately took flight on foot crossing the street onto the Prince George's County side.' Officer Phillip testified that he had reasonable, articulable suspicion that Bost was concealing something and that based upon his experience, he believed that Bost was 'trying to conceal a weapon' and because Bost was 'holding ... his waistband, continuously looking back.' Bost ran into a wooded area, falling several times, each time clutching at his right side. The officers followed in pursuit, eventually crossing into Prince George's County, Maryland,"

*id.* at 345–46, 958 A.2d at 359, the divided court concluded that the officer was in fresh pursuit and, so lawfully seized the defendant and the weapon. *Id.* at 360, 958 A.2d at 367.

than an approach to another with the intention of conducting further investigation.

Courts have variously labeled "pursuit," *i.e.* hot pursuit, fresh or immediate pursuit, and investigative pursuit. Whatever difference there may be between the various iterations, what is characteristics of each is purposeful movement, and, perhaps, evasive movement, by the pursued, usually in the form of a chase, consisting of the police officer trying to apprehend the suspect or violator and the suspect or violator attempting to avoid it. *Scott v. Harris,* 550 U.S. 372, 375, 127 S.Ct. 1769, 1773, 167 L.Ed.2d 686, 690–91 (2007) ("Following respondent's shopping center maneuvering which resulted in ·slight damage to Scott's police car, Scott took over as the lead pursuit vehicle."); *County of Sacramento v. Lewis,* 523 U.S. 833, 844, 118 S.Ct. 1708, 1715, 140 L.Ed.2d 1043, 1056 (1998) ("We illustrated the point by saying that no Fourth Amendment seizure would take place where a 'pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit,' but accidentally stopped the suspect by crashing into him. [*Brower v. County of Inyo,* 489 U.S. 593, 597, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628, 635 (1989) ]."); *Welch v. United States,* 604 F.3d 408 (7th Cir.2010) ("If an offender fails to report or leaves while beyond the presence of security, there is no immediate pursuit or other attempt to apprehend.... By contrast, one who flees a police officer in a vehicle draws attention to himself, challenges the immediate authority of the police officer and calls on the officer to give immediate chase."); *Southers v. City of Farmington,* 263 S.W.3d 603, 608 (Mo.2008) ("The Farmington Police Department ... was alerted to the robbery and given a description of the suspect and the vehicle in which he fled. Police Officer Lindell Barton saw the suspect traveling south on Maple Valley Drive. He activated his lights and siren and pursued the suspect in a high-speed chase, reporting over the police radio that he was in pursuit."); *Tidwell v. Denver,* 83 P.3d 75, 82 (Co.2003) ("Officer McAleer was engaged in a 'pursuit' as that term is ordinarily understood. Here, the driver of the Oldsmobile fled

the scene of the initial stop in a clear attempt to avoid arrest or further investigation. . . . Officer McAleer hurriedly followed the driver in order to apprehend him. Accordingly, Officer McAleer was engaged in a 'pursuit' for purposes of 42–4–108."); *Cruz v. Briseno*, 22 Cal.4th 568, 93 Cal.Rptr.2d 715, 994 P.2d 986, 987–88 (2000) (Officer Briseno followed a speeding vehicle "with the intention of issuing the driver a citation for excessive speed." Failing to stop at a red light signal, the vehicle crashed into an oncoming car, killing its driver. On the issue of immunity, the court, determined that "the facts alleged clearly indicate that, by the time the accident occurred, Briseno was in immediate pursuit" because the "suspect[ ] [was a] traffic offender whom Briseno had been following and who, moments earlier, had run a red light in his presence."); *Michigan v. Lambert*, 174 Mich.App. 610, 436 N.W.2d 699, 701 (1989)(" 'Investigative pursuits' or 'chases' have also been upheld as lawful police conduct. . . ."); *State of Connecticut v. Oliver*, 17 Conn.App. 108, 550 A.2d 316, 317 (1988) ("At this point, the defendant and the other man suddenly dashed off . . . prompting each police officer to chase one of them on foot. During the chase, the defendant dropped a pouch which was picked up by the pursuing officer."). All these cases have a similar underlying theme. In each case, the person pursued, whether aware of the officer's approach or not, was moving [10] and the officer was also moving in his or her direction.

It should also be noted that, contrary to the findings of the Circuit Court and the position espoused by the petitioner, ("The pursuit of a violator or suspected violator of the law by police is created by the officer's perception of the present commission of a crime, or the officer's reasonable belief that a crime has been committed."), this Court will hold that what the officer believes subjectively, may not accurately address, or tend to determine, whether there has been a "pursuit;" such intent cannot always reflect or account for the actions of

---

**10.** While it is likely that "pursue" as used in—§ 19–103—contemplates also that the pursued be aware of the pursuit, it is not necessary to so hold to resolve this case consistent with legislative intent.

all of the parties. That said, an officer's perception of the situation, *i.e.* whether he or she is in pursuit or not, may help inform the court as whether a pursuit occurred, but is not dispositive and cannot change what is not a pursuit, into one. While how the officer characterizes the situation and his or her intent is properly a part of the inquiry, the true nature of the situation, *e.g.* chase, stakeout, or investigation, ultimately controls whether it falls squarely within the § 19–103(a)(3)(ii) exceptions.

If it were otherwise, if intent is the decisive factor, not only would the results be inconsistent, but, and more important, the determination would not be subject to objective evaluation and verification. Immunity would be subject to abuse. What would prevent a police officer from, after-the-fact, categorizing his or her conduct as "pursuit" in order to shield him or herself from liability? In order for "pursuit" to occur, the suspect or violator of the law, at a minimum, has to be moving. If standing still that person is not subject to being followed. The most that can be said is that, when contact is made with him or her, he or she will have been approached and apprehended.

Sections 19–103 and 5–639 were enacted by the General Assembly to provide immunity to police officers under certain clearly delineated emergency circumstances. One of those circumstances is when the officer is pursuing the perpetrator or suspected perpetrator of a crime. Under this exception, the "pursuit" must be underway. Section 19–103(a)(3)(ii) requires that the officer be engaged in trying to overtake or apprehend or pursue a suspect.

If the word "pursuing" in § 5–639 is to have meaning, it cannot encompass every non-emergency situation in which a police officer patrols or undertakes to investigate suspicious behavior. Surely, the Maryland Legislature did not intend to convert all routine police officer investigations into "emergency service." Section 19–103 is specifically reserved for emergency situations. Accordingly, construing and taking the word "pursuing," as used in §§ 19–103(a)(3)(ii) and 5–639, in

context, with the Legislature's intention in enacting the statute, and the relevant case law, the petitioner is not eligible for the immunity afforded by that statute. When, as we have seen, the accident in question occurred, the petitioner was not "[p]ursuing ... a suspected violator of the law" as § 19–103(a)(3)(ii) requires. The petitioner, having observed suspicious behavior, intended to, and, indeed, began to investigate further; he made a maneuver which was designed to enable him to approach the suspects. The petitioner's intended targets did not move, buttressing the characterization of the petitioner's actions by the respondents, that the petitioner was acting to approach his targets, rather than, as a result of exigency, "pursue" them. Our holding recognizes the boundaries carved out by the Legislature when it enacted § 19–103(a)(3).

## II. *Common Law Public Official Immunity*

Asserting that he is a public official, who, when the accident occurred, was exercising discretion and acting within the scope of his law enforcement functions, the petitioner argues that he is entitled to common law public official immunity. That being so, he urges, he is immune from the negligence claims brought against him by the respondents. Critical to the viability of that argument is the applicability of § 5–507 to members of the Baltimore City Police Department. To establish that link, the petitioner cites *Ashton v. Brown,* 339 Md. 70, 116 n. 23, 660 A.2d 447, 469 n. 23 (1995), for the proposition that § 5–507 was enacted by the General Assembly to "[s]afeguard[ ] common law public official immunity" and, while conceding that the Baltimore City Police Department is a State agency, makes the point that

"it is defined as a 'local government' for purposes of LGTCA.[11] Thus, employees of the Department are re-

---

11. Maryland Code (1987, 2006 Repl.Vol.) § 5–301(d)(21) of the Courts and Judicial Proceedings Article, the Local Government Tort Claims Act.

garded as local government employees. City police officers therefore have the protection provided by LGTCA," (quoting *Smith v. Danielczyk*, 400 Md. 98, 111 n. 6, 928 A.2d 795, 803 n. 6 (2007)), a status it shares with municipalities and municipal corporations. *See* Maryland Code (1987, 2006 Repl. Vol.) § 5–301(d)(5) of the Courts and Judicial Proceedings Article. From these premises, he argues:

> "Based on MD.Code Anno. Cts. and Jud. Proc. Art. § 5–507(b)(1),[12] Officer Schreyer possesses common law public official immunity from suit from negligence committed in the course of his efforts to stop the suspected violators of the law that he had observed."

▮▮▮ The petitioner is wrong for two reasons. First, § 5–507(b) is, by its very terms, applicable to municipal corporations and officers of those corporations; it does not extend to

---

**12.** It is interesting that the petitioner relies on subsection (b)(1), rather than subsection (b)(2), which specifically addresses the immunity from liability of an official as a result of "negligence or other tort arising from the operation of a motor vehicle" and, in fact, seems to suggest that this more general provision subsumes the narrower one. That approach is the direct opposite of our statutory construction jurisprudence. *Lumbermen's Mut. Cas. Co. v. Ins. Comm'r*, 302 Md. 248, 268, 487 A.2d 271, 281 (1985) ("It is an often repeated principle that a specific statutory provision governs over a general one. *Director of Fin., Pr. George's Co. v. Cole*, 296 Md. 607, 635, 465 A.2d 450 (1983); *Zellinger v. CRC Dev. Corp.*, 281 Md. 614, 625, 380 A.2d 1064 (1977); *Prince George's Co. v. Laurel*, 262 Md. 171, 182–183, 277 A.2d 262 (1971); *Rafferty v. Comptroller*, 228 Md. 153, 158, 178 A.2d 896 (1962). Thus where one statutory provision specifically addresses a matter, and another more general statutory provision also may arguably cover the same matter, the specific statutory provision is held to be applicable and the general provision is deemed inapplicable."); *Douglass v. State*, 78 Md.App. 328, 335, 552 A.2d 1371, 1374 (1989)("Under this ... rule of construction, the conduct specifically proscribed by subsections (b)(2) through (5) would be regarded as excluded from the ambit of subsection (b)(1), even though, but for the specific proscriptions, it would fall within the reach of that general offense."); *see also* Norman J. Singer, Sutherland, Statutory Construction, § 51.05 (4th ed.1986) (footnotes omitted) ("Where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail, regardless of whether it was passed prior to the general statute, unless it appears that the legislature intended to make the general act controlling.").

Baltimore City police officers. In *Houghton v. Forrest,* 412 Md. 578, 989 A.2d 223 (2010), this Court made this clear. In that case, a Baltimore City police officer was sued for intentional and constitutional torts. He defended by claiming, *inter alia,* that he was entitled to immunity under § 5–507. *Houghton,* 412 Md. at 582, 989 A.2d at 226. Addressing the question whether section § 5–507(b) applied to Baltimore City police officers, this Court opined:

"[M]unicipal official immunity under CJ Section 5–507(b) does not apply because the BCPD was created as a state agency, through an act of the General Assembly, and not as a municipal agency. *See* 1867 Md. Laws 761–74 (establishing the BCPD and defining its duties); *see also Mayor & City Council of Balt. v. Clark,* 404 Md. 13, 28, 944 A.2d 1122, 1131 (2008) (holding that 'notwithstanding the Mayor's role in appointing and removing the City's Police Commissioner, the Baltimore City Police Department is a state agency.'). Since that time, 'this Court has consistently held that Baltimore City should not be regarded as the employer of members of the [BCPD] for purposes of tort liability.' *Clea v. Mayor of Balt.,* 312 Md. 662, 668, 541 A.2d 1303, 1306 (1988). Thus, for the purposes of tort liability, Houghton is an employee of a state agency and not a municipal agency. He therefore cannot claim to be a municipal official, and cannot claim municipal official immunity."

*Id.* at 588–89, 989 A.2d at 229. It follows that, consistently, the petitioner *sub judice* is also not eligible for immunity pursuant to § 5–507(b).

█ The petitioner's argument is not simply that he is entitled to "common law public official immunity," but, rather, that immunity as codified in § 5–507(b) and, more particularly, in subsection (b)(1). Even had we not addressed the issue head-on, the path by which the petitioner poses to bring himself within the ambit of § 5–507 logically does not get him there. Section 5–507 and § 5–304 are different statutes, which, conceding a degree of overlap, generally apply to different officials. To be sure, both the Baltimore City Police Department and municipal corporations have been included by

the General Assembly in the definition of "Local Government." That legislative decision, however, did not render them identical; despite being legislatively placed under the broad definition of "Local government," rather than becoming one and the same, thus, interchangeable, both the Baltimore City Police Department and municipal corporations retained their distinct and separate identities. Municipal corporations were not thereby transformed to a local government entity; they remained municipal corporations. The Baltimore City Police Department was not thereby possessed of the attributes of a municipal corporation, in addition to its status as a local government. In short, that the Baltimore City Police Department is a local government, and, thus, subject to the LGTCA, does not make it also a municipal corporation to which § 5–507 applies.

Since the viability of the petitioner's argument is dependent on § 5–507 being applicable and we have concluded that the connection between it and the Baltimore City Police Department cannot logically be made, we hold that the petitioner is not entitled to common law immunity, as he claims, under § 5–507.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED, WITH COSTS.

HARRELL, BATTAGLIA and BARBERA, JJ., dissent.

BARBERA, J., dissenting, in which HARRELL and BATTAGLIA, JJ., join.

I dissent. I would hold that Petitioner's conduct entitles him to immunity under Maryland Code (1977, 2009 Repl.Vol.), § 19–103(a)(3)(ii) of the Transportation Article (hereafter "§ 19–103(a)(3)(ii)"), and Maryland Code (2006 Repl.Vol., 2008 Supp.), § 5–639 of the Courts and Judicial Proceedings Article (hereafter "§ 5–639").

The majority and I agree that Petitioner, at the time of the accident, was authorized to operate an emergency vehicle. *See* Md.Code (1957, 2006 Repl.Vol.), § 11–118 of the Transportation Article. We also agree that the only form of "emergen-

cy service" that Petitioner's conduct in this case could come within is that described in § 19–103(a)(3)(ii), "[p]ursuing a violator or a suspected violator of the law." *See* Maj. op. at 99–100, 5 A.3d at 1057

Where the majority and I part company is in our construction of the phrase "pursuing a violator or a suspected violator of the law." I am persuaded that the General Assembly did not intend to restrict its grant of immunity for police officers operating an emergency vehicle only to those circumstances when there is "movement by a suspect or violator of the law, and reactive movement by the officer to apprehend said individual," as the majority holds. Maj. op. at 99, 5 A.3d at 1057. In my view, proper application of the rules of statutory construction to § 19–103(a)(3)(ii) dictates a broader, more commonsense construction, one that includes an officer's approach of an individual suspected at that moment to be breaking the law, with the intention of investigating and, if appropriate, intervening and apprehending the suspect.

I need not recount all of the pertinent rules of statutory construction, as the majority does a thorough job of it. I simply repeat, for emphasis, several of them. When construing a statute, the primary objective is to ascertain and effectuate the intent of the legislature. *See, e.g., Magnetti v. University of Maryland,* 402 Md. 548, 564, 937 A.2d 219, 228–29 (2007). To ascertain the legislature's intent, "we look first to the plain language of the statute, and if that language is clear and unambiguous, we look no further than the text of the statute." *Newell v. Runnels,* 407 Md. 578, 640, 967 A.2d 729, 766 (2009) (internal quotation marks and citations omitted). "The plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Magnetti,* 402 Md. at 564–65, 937 A.2d at 229 (internal quotation marks and citation omitted). As long as the language of the statute is unambiguous, "either inherently or by references to other relevant laws or circumstances, our inquiry as to legislative intent ends." *Newell,* 407 Md. at 641, 967 A.2d at 766.

Further, as the majority points out, Maj. op. at 101, 5 A.3d at 1058 "the absence of an express definition of a term ... does not preclude us from construing its plain meaning." We are permitted " 'to consult the dictionary to elucidate terms that are not defined in the statute.' " *Id.* at 101, 5 A.3d at 1058 (citation omitted). Though consultation with the dictionary is a " 'starting point' " to ascertaining the Legislative intent, it is " 'not necessarily the end.' " *Id.* (citation omitted).

I, like the majority, turn first to the dictionary to define the verb "pursue," and, for completeness, the noun "pursuit." The Random House Dictionary of the English Language, in relevant part, defines "pursue" as "1. to follow in order to overtake, capture, kill, etc.; chase. 2. to follow close upon; go with; attend," and it defines "pursuit" as: "1. the act of pursuing"; and "2. an effort to secure or attain; quest[.]" 1570 (2d ed.1987). The current version of Black's Law Dictionary does not define pursue; it defines "pursuit," however, as: "1. An occupation or pastime. 2. The act of chasing to overtake or apprehend." BLACK'S LAW DICTIONARY 1272 (8th ed.2004). These definitions, and those offered by the majority, Maj. op. at 106–10, 5 A.3d at 1061–63 embrace the conduct described by the majority ("movement by a suspect or violator of the law, and reactive movement by the officer to apprehend said individual"). Indeed, it is fair to say that the conduct the majority describes lies at the core of the meaning of "pursue." But it does not follow that these dictionary definitions exclude the conduct of Petitioner in the present case. A commonsense construction of "pursuing," in the context of the statute we examine, should include movement by the officer that approaches the suspect in an effort to "overtake" the suspect for purposes of investigation and, if appropriate, to "apprehend" him or her. Application to § 19–103(3)(ii) of this broader definition of "pursuing," moreover, is consistent with what I suspect was the intent of the General Assembly in enacting that section and § 5–639: to protect law enforcement officers from liability for negligent acts associated with split-second decision-making that accompanies the operation of an emergency vehicle in "emergency service."

I read the majority's construction of § 19–103(a)(3)(ii) as not requiring that the individual being pursued be aware that he or she is being pursued. *See* Maj. op. at 115–16, 5 A.3d at 1066–67. I agree that knowledge by the pursued is not necessary to application of the immunity afforded by the statute. I also agree with the majority that the statute requires the existence of "exigent circumstances." Maj. op. at 113, 5 A.3d at 1064. The required exigency in the scenario at bar is, of course, the need of the police officer to intercept a crime in progress in or near the officer's presence.

In a given case, the need to act may be more or less exigent than in other situations. Yet I do not read the majority opinion as intending to limit the applicability of the immunity statute to the officer's pursuit of only those individuals who are known or suspected of having committed a certain class of crimes. Neither would I read such a limitation into the statute. Suppose, for example, that Petitioner had observed from his police cruiser persons whom he suspected had just committed an armed bank robbery, standing near or walking from the crime scene; he pursued them in the fashion done here; and, in doing so, he acted negligently and caused an accident. In my view, it defies the obvious intent of the immunity statute not to have it apply to the officer's negligent act committed while employing his vehicle to pursue, even stealthily (if that were the officer's choice) the suspected armed robbers.

I disagree with the majority, *see* Maj. op. at 109–110, 115–16, 5 A.3d at 1062–63, 1066–67, that the officer's approach of the crime suspect (or violator) must be triggered by some movement on the part of the individual herself, before the approach can be deemed a "pursuit," for immunity purposes. Returning to the bank robbery scenario, it makes no sense to me that the General Assembly would not have intended to afford immunity to an officer who commits a negligent act while pursuing suspected bank robbers, even if, at the time the officer launched the pursuit, the suspects were standing still. In my view, Petitioner was no less in pursuit of the suspected drug dealer he spotted in the alley than he would

have been had the suspect moved in a direction away from Petitioner, and Petitioner reacted to that movement.

At trial, Petitioner testified that the most effective way to pursue or "catch ... narcotics violators" is to use stealth. Petitioner intended to confirm, upon his arrival at the scene, that the suspects were engaged in illegal narcotics sales and (I presume), if appropriate, arrest one or more of them. Before he could confront the suspects, however, Petitioner's vehicle collided with the vehicle in which Respondents were traveling, and the suspects dispersed. Even though the suspects escaped before Petitioner could initiate contact, these facts demonstrate that Petitioner's conduct before the accident was an immediate attempt to intercept criminal activity and apprehend the perpetrators. It is the officer's decision to apprehend a suspect, not a suspect's awareness of law enforcement efforts, that determines whether the officer is "trying to overtake or apprehend," or "pursuing," the suspect within the meaning of the operative immunity statute. Petitioner's conduct, as we just described it, fits the bill.

The majority acknowledges, Maj. op. at 110–111, 5 A.3d at 1063–64 that the purpose of §§ 19–103 and 5–639 is to protect police officers who operate emergency vehicles in furtherance of the performance of their duties. *See, e.g.,* Public Local Laws of Baltimore City § 16–2(a) (establishing that the Baltimore City police officers have "the specific duty and responsibility ... to detect and prevent the commission of crime [ ] ... [and] to apprehend and arrest criminals and persons who violate [the laws of this State or of the Mayor and City Council of Baltimore] or are lawfully accused of violating such laws and ordinances"). Rather than leave any ambiguity as to whether the officers are protected under other statutes or common law principles for liability incurred while operating emergency vehicles, §§ 19–103 and 5–639 provide officers with specific protection. Furthermore, just as the public official immunity doctrine (to which I refer simply as a point of reference) protects public officials from liability incurred while exercising their discretionary authority, §§ 19–103 and 5–639 ensure that law enforcement officers have "the freedom and

authority to make decisions and choices" while operating emergency vehicles in "emergency service," without fear of personal economic responsibility. *Lee v. Cline,* 384 Md. 245, 261, 863 A.2d 297, 306 (internal quotation marks and citations omitted). The narrow interpretation the majority gives to "pursuing," as used in § 19–103(a)(3)(ii), seriously undermines that function.

In sum, I would reverse the judgment of the Circuit Court on the ground that Petitioner is entitled to immunity under § 5–639 for the emergency service he performed in pursuing a person suspected of violating the law. I would remand the case to the Circuit Court for Baltimore City with directions to vacate the judgment of the District Court and enter judgment in favor of Petitioner.

Judges HARRELL and BATTAGLIA have authorized me to state that they join in this opinion.